IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| PEACHTREE HOTEL GROUP II, LLC, derivatively on behalf of PHG JACKSONVILLE, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>JAX FAIRFIELD HOTEL GROUP, LLC; JAX FAIRFIELD FINANCIAL, LLC; CHITTRANJAN K. THAKKAR; NILOY THAKKAR; ROHAN THAKKAR; NILHAN FINANCIAL, LLC; NRCT, LLC; NILOY & ROHAN, LLC; DCT SYSTEMS GROUP, LLC; NILHAN DEVELOPERS, LLC; SUGARLOAF CENTRE, LLC; BAY CIRCLE PROPERTIES, LLC; SALONI THAKKAR; and WELLS FARGO BANK, N.A.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br>_____<br><br>Removed from the Superior Court of Fulton County, Georgia:<br>Civil Action File No. 2015-CV-266007<br><br>ATTEST: A TRUE COPY<br>CERTIFIED THIS<br><br>OCT 2 1 2015<br><br>JAMES N. HATTEN, CLERK<br>By: _____<br>              Deputy Clerk |

## NOTICE OF REMOVAL

Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), hereby removes the

above-styled Civil Action File No. 2015-CV-266007 (the "Superior Court Action")

filed by Peachtree Hotel Group II, LLC, derivatively on behalf of PHG

Jacksonville, LLC ("Plaintiff"), from the Superior Court of Fulton County, Georgia, to this Court pursuant to 28 U.S.C. §§ 1334(b), 1452(a), and 1446.

## Bankruptcy "Related to" Jurisdiction Exists
## Under 28 U.S.C. § 1334

A.    *"Related to" Jurisdiction By Virtue of Claims Against the Debtors*

1.    The Defendants in the Superior Court Action include, in addition to Wells Fargo and others, Bay Circle Properties, LLC ("Bay Circle"), DCT Systems Group, LLC ("DCT"), Sugarloaf Centre, LLC ("Sugarloaf"), Nilhan Developers, LLC ("Nilhan Developers"), and NRCT, LLC ("NRCT" and, together with Bay Circle, DCT, Sugarloaf and Nilhan Developers, collectively, the "Debtors").

2.    On May 4, 2015, the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (11 U.S.C. § 101, *et seq.*, the "Bankruptcy Code"), initiating the Chapter 11 bankruptcy cases (collectively, the "Bankruptcy Cases") being jointly administered in the case styled *In re Bay Circle Properties, LLC, et al.*, Case No. 15-58440-wlh, United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court").

3.    District courts have jurisdiction over all proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).  The Bankruptcy Court has authority to hear such matters pursuant to 28 U.S.C. § 157(a).    In addition, the court in which a bankruptcy case is pending has

jurisdiction over all property of the debtor and estate, wherever located. 28 U.S.C. § 1334(e).

4.    Upon filing the Bankruptcy Cases, the Debtors' assets became property of their respective bankruptcy estates pursuant to section 541 of the Bankruptcy Code, and section 362 of Bankruptcy Code operated as an automatic stay of, among other actions, the commencement of judicial proceedings to recover claims against the Debtors and acts to exercise control of property of the estate. *See* 11 U.S.C. § 362(a)(1) and (3).

5.    The Superior Court Action triggers "related to" jurisdiction in that Plaintiff has asserted numerous claims against the Debtors seeking, among other relief, damages and pre-judgment attachment against several parcels of real property owned by the Debtors that serves as collateral for loans made by Wells Fargo. (Compl., Counts III, VI, VII, VIII, X and IX.) Specifically, Plaintiff asserts claims against the Debtors for conversion, unjust enrichment, avoidance of, and alleged damages suffered as a result of, alleged fraudulent transfers, pre-judgment attachment, and money had and received. *Id.*

B.    *"Related to" Jurisdiction By Virtue of The Effect on Administration of the Debtors' Estates*

6.    Even if the Debtors and the claims against them and their properties were dismissed from the Superior Court Action, bankruptcy "related to"

jurisdiction over the Superior Court Action would remain because resolution of the action will have a significant effect on the administration of the Debtors' estates. For example, Wells Fargo's expenses in defending the claims against it in the Superior Court Action, and any adverse judgment or settlement of the claims against Wells Fargo, will be recoverable from the Debtors in accordance with the loan documents governing Wells Fargo's relationships with the Debtors.[1] Therefore, the cost of defending the Superior Court Action, or paying any judgment therein or settlement thereof, will increase the amount of Wells Fargo's secured claims in the Debtors' Bankruptcy Cases.

7.     Finally, if the Bankruptcy Court deems that some but not all of Plaintiff's claims relate to the Bankruptcy Cases under 28 U.S.C. § 1334, it has ancillary jurisdiction over the remaining claims under 28 U.S.C. § 1367.

### General Requirements

*A.     Authority for Removal*

8.     This Notice of Removal is based upon bankruptcy jurisdiction pursuant to 28 U.S.C. § 1334, and this removal is in accordance with 28 U.S.C. § 1452 and Fed. R. Bankr. P. 9027.

---

[1] The monies sought to be recovered from Wells Fargo were earmarked to pay and were applied to pay loans guaranteed by the Debtors.

*B.      Removal to This Court is Proper*

9.      This Notice of Removal is filed in the Atlanta Division of the United States District Court for the Northern District of Georgia as the "district and division within which is located the state…court where the civil action is pending." Fed. R. Bankr. P. 9027(a)(1); *see also* 28 U.S.C. § 90(a)(2) ("The Northern District comprises four divisions.***The Atlanta Division comprises the counties of …Fulton….")  However, Wells Fargo requests that this matter be referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and the Standing Order entered by the United States District Court for the Northern District of Georgia on July 12, 1984, pursuant to which all procedings related to a case under Title 11 are referred to the bankruptcy judges of the Northern District.  A copy of the Standing Order is attached hereto as Exhibit A.

*C.      This is a Core Matter*

10.     In accordance with Fed. R. Bankr. P. 9027(a)(1), Wells Fargo states that the Superior Court Action is a core matter pursuant to 28 U.S.C. §§ 157(b)(2) because it involves matters concerning the administration of the estate (28 U.S.C. §§ 157(b)(2)(A)), constitutes a proceeding to determine, avoid, or recover fraudulent conveyances (28 U.S.C. §§ 157(b)(2)(H)), and affects the liquidation of

the assets of the Debtors' estates or the adjustment of the debtor-creditor relationship (28 U.S.C. §§ 157(b)(2)(O)).

D.    *Copy of Process and Pleadings Attached*

11.    In accordance with Fed. R. Bankr. P. 9027(a)(1), attached hereto as Exhibit B is a true and accurate copy of all process, orders, and pleadings received by Wells Fargo in the Superior Court Action.

E.    *Removal Is Timely*

12.    Plaintiff instituted the Superior Court Action on September 21, 2015. Wells Fargo received a copy of the Summons and Complaint on or about September 25, 2015. In accordance with 28 U.S.C. § 1446(b) and Fed. R. Bankr. P. 9027(a)(3), this Notice of Removal is timely filed within 30 days after receipt of a copy of the initial pleading setting forth the claims sought to be removed.

WHEREFORE, having met all of the requirements for removal, Wells Fargo hereby gives notice of its removal of the Superior Court Action to the United States District Court for the Northern District of Georgia, and requests that this civil action be referred to the Bankruptcy Court and that no further proceedings be had in said case in the Superior Court of Fulton County, Georgia.

Respectfully submitted this 9th day of October, 2015.

**PARKER, HUDSON, RAINER & DOBBS LLP**

By: */s/ Joshua J. Lewis*
    C. Edward Dobbs
    Georgia Bar No. 223450
    William J. Holley, II
    Georgia Bar No. 362310
    Joshua J. Lewis
    Georgia Bar No. 303211

1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
Telephone: (404) 523-5300
Facsimile: (404) 522-8409          *Attorneys for Wells Fargo Bank, N.A.*

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), the undersigned counsel hereby certifies that the foregoing pleading has been prepared in Times New Roman 14 point, one of the fonts and points approved by LR 5.1(B).

Respectfully submitted this 9th day of October, 2015.

**PARKER, HUDSON, RAINER & DOBBS LLP**

By: */s/ Joshua J. Lewis*
    C. Edward Dobbs
    Georgia Bar No. 223450
    William J. Holley, II
    Georgia Bar No. 362310
    Joshua J. Lewis
    Georgia Bar No. 303211

1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
Telephone: (404) 523-5300
Facsimile: (404) 522-8409    *Attorneys for Wells Fargo Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing **NOTICE OF REMOVAL** upon all counsel of record in this matter by depositing a true copy of same in the U.S. Mail, proper postage prepaid, addressed as follows:

> HALL & LAMPROS, LLP
> c/o Cristopher B. Hall, Esq.
> Promenade Two, Suite 950
> 1230 Peachtree Street, NE
> Atlanta, Georgia 30309
>
> ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD
> Jeremy Littlefield, Esq.
> 999 Peachtree Street, NE
> Suite 1120
> Atlanta, Georgia 30309
>
> SCHREEDER, WHEELER & FLINT, LLP
> c/o John A. Christy, Esq.
> 1100 Peachtree Street
> Suite 800
> Atlanta, Georgia 30309

This 9th day of October, 2015.

> /s/ Joshua J. Lewis
> Joshua J. Lewis

3981463_2

# EXHIBIT A

AO 72A
(Rev. 8/82)

*Original*

FILED IN CLERK'S OFFICE
U.S.D.C. ~ Atlanta

JUL 12 1984

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:      JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT
            NORTHERN DISTRICT OF GEORGIA

### ORDER

All cases under Title 11 U.S.C. and all proceedings arising
under Title 11 U.S.C. or arising in or related to a case under
Title 11 U.S.C. are hereby and shall hereinafter be referred to
the bankruptcy judges of this district pursuant to 28 U.S.C. §
157 as contained in Public Law 98-353; 98 Stat. 333, nunc pro
tunc as of July 11, 1984, pursuant to a direction of the judges
of this Court at a meeting this day at which a quorum was
present.

SO ORDERED, this _12_ day of July, 1984.

CHARLES A. MOYE, JR.
Chief United States District Judge

# EXHIBIT B



## IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
136 Pryor Street, Room C-103, Atlanta, Georgia 30303
### SUMMONS

|  |  |
|---|---|
| PEACHTREE HOTEL GROUP II, LLC, DERIVATIVELY ON BEHALF OF PHG JACKSONVILLE, LLC, | ) ) ) |
| Plaintiff, | ) ) Case No. 2015CV266007 |
| v. | ) ) |
| WELLS FARGO BANK, NA | ) ) |
| Defendant. | ) ) |
| c/o Corporation Service Company 40 Technology Pkwy, Suite 300 Norcross, GA 30092 | ) ) ) ) |

**TO THE ABOVE NAMED DEFENDANT:**

You are hereby summoned and required to file with Clerk of said Court and serve upon plaintiff's attorney, whose name and address is:

> Christopher B. Hall
> Hall & Lampros, LLP
> 1230 Peachtree St. NE
> Suite 950
> Atlanta, GA 30309

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This the ____ day of September, 2015.

> Honorable Cathelene "Tina" Robinson
> Clerk of Superior Court
>
> By: _____
>                 Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 2015.

_____
Deputy Sheriff / Process Server

IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
136 Pryor Street, Room C-103, Atlanta, Georgia 30303
## SUMMONS

PEACHTREE HOTEL GROUP II, LLC, DERIVATIVELY )
ON BEHALF OF PHG JACKSONVILLE, LLC,          )
                                             )
      Plaintiff,                          )
                                             )    Case No. _____
v.                                           )
                                             )
WELLS FARGO BANK, NA                         )
                                             )
      Defendant.                          )
                                             )
c/o Corporation Service Company              )
40 Technology Pkwy, Suite 300                )
Norcross, GA 30092                           )

### ADDENDUM TO SUMMONS TO WELLS FARGO BANK, NA

Additional Defendants:

    Niloy Thakkar
    17885 Collins Ave.
    Unit 4001
    Sunny Isles Beach, FL 33160

    Rohan Thakkar
    17885 Collins Ave.
    Unit 4001
    Sunny Isles Beach, FL 33160

    Chittranjan Thakkar
    9350 Colonnade Trail
    Alpharetta, GA 30022

    Jax Fairfield Financial, LLC
    c/o Niloy Thakkar
    17885 Collins Ave.
    Unit 4001
    Sunny Isles Beach, FL 33160

    Sugarloaf Centre, LLC
    c/o Niloy Thakkar
    17885 Collins Ave.
    Unit 4001
    Sunny Isles Beach, FL 33160

    Jax Fairfield Hotel Group, LLC
    c/o Niloy Thakkar
    17885 Collins Ave.

Unit 4001
Sunny Isles Beach, FL 33160

Nilhan Developers, LLC
c/o Chittranjan Thakkar
9350 Colonnade Trail
Alpharetta, GA 30022

Bay Circle Properties, LLC
c/o Chittranjan Thakkar
9350 Colonnade Trail
Alpharetta, GA 30022

Nilhan Financial, LLC
c/o Chittranjan Thakkar
9350 Colonnade Trail
Alpharetta, GA 30022

NRCT, LLC
c/o Chittranjan Thakkar
9350 Colonnade Trail
Alpharetta, GA 30022

Niloy & Rohan, LLC
c/o Chittranjan Thakkar
9350 Colonnade Trail
Alpharetta, GA 30022

DCT Systems Group, LLC
c/o Chittranjan Thakkar
9350 Colonnade Trail
Alpharetta, GA 30022

Saloni Thakkar
9350 Colonnade Trail
Alpharetta, GA 30022

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

PEACHTREE HOTEL GROUP II, LLC,
derivatively on behalf of PHG
JACKSONVILLE, LLC,

      Plaintiff,

v.

JAX FAIRFIELD HOTEL GROUP,
LLC; JAX FAIRFIELD FINANCIAL,
LLC; CHITTRANJAN K. THAKKAR;
NILOY THAKKAR; ROHAN
THAKKAR; NILHAN FINANCIAL,
LLC; NRCT, LLC; NILOY & ROHAN,
LLC; DCT SYSTEMS GROUP, LLC;
NILHAN DEVELOPERS, LLC;
SUGARLOAF CENTRE, LLC; BAY
CIRCLE PROPERTIES, LLC; SALONI
THAKKAR; and WELLS FARGO
BANK, NA;

      Defendants.



FILED IN OFFICE

SEP 21 2015

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

Civil Action No. 2015CV266007

### PLAINTIFF'S COMPLAINT

Plaintiff Peachtree Hotel Group II, LLC, derivatively on behalf of PHG

Jacksonville, LLC, files this Complaint against Defendants JAX Fairfield Hotel Group,

LLC; JAX Fairfield Financial, LLC; Chittranjan K. Thakkar; Niloy Thakkar; Rohan

Thakkar; Nilhan Financial, LLC; NRCT, LLC; Niloy & Rohan, LLC; DCT Systems

Group, LLC; Nilhan Developers, LLC; Sugarloaf Centre, LLC; Bay Circle Properties,

LLC; Saloni Thakkar; and Wells Fargo Bank, NA, and alleges as follows:

1

## COMMENCEMENT OF DERIVATIVE ACTION

1.　　This is a derivative action pursuant to O.C.G.A. §14-11-801.  Peachtree Hotel Group II, LLC ("PHGII") and JAX Fairfield Hotel Group, LLC ("JAX Hotel") each are managers, and together are the sole managers of PHG Jacksonville.  PHGII and JAX Hotel each are members, and together are the sole members, of PHG Jacksonville.  On April 23, 2015, PHGII demanded, pursuant to O.C.G.A. §14-11-801(2), that JAX Hotel, its members, and managers take suitable action and authorize PHGII to cause a lawsuit to be filed by PHG Jacksonville to recover Embarc, LLC ("Embarc") loan repayment proceeds owed to PHG Jacksonville and misappropriated by Defendants. After due demand, notice, and the expiration of 90 days, JAX Hotel, its members, and managers refused to take suitable action, and PHGII has met the conditions for commencement of a derivative action on behalf of PHG Jacksonville.

2.　　Plaintiff does not have the sole authority to cause PHG Jacksonville to sue in its own right under the provisions of the articles of organization or a written operating agreement.

3.　　Plaintiff was a member of PHG Jacksonville at the time of the bringing of this action, and was a member of PHG Jacksonville at the time of the transactions about which Plaintiff complains.

4.　　Plaintiff fairly and adequately represents the interests of PHG Jacksonville in enforcing its rights.

## NATURE OF THE CASE

5.      This case involves conversion, racketeering, breach of contract, breach of fiduciary duty, fraud, and fraudulent transfers of over $2,035,366 owed to PHG Jacksonville relating to a Jacksonville hotel real estate deal ("the hotel deal").

### Categories of Defendants

6.      Defendants can be described in four categories.

7.      The first category includes those Defendants who were participants in the hotel deal and who converted $2,035,366 in proceeds from the hotel deal that belonged to PHG Jacksonville.  This category of Defendants includes JAX Hotel, JAX Financial, Chittranjan K. Thakkar, Niloy Thakkar, and Rohan Thakkar.  This first category of Defendants shall collectively be referred to as the Hotel Deal Defendants.

8.      The second category of Defendants are those persons and entities who were not Hotel Deal Defendants, but who converted and/or received stolen proceeds of the hotel deal in the form of $2,035,366 in loan payoffs for their benefit.  These Defendants were the borrowers on two defaulted loans from Wells Fargo, and they utilized PHG Jacksonville's funds to pay down the loans.  This category of Defendants includes Saloni Thakkar, Niloy, Inc., and Nilhan Financial, LLC.  These Defendants shall collectively be referred to as the Borrower Defendants.

9.      The third category includes those Defendants that were not Hotel Deal Defendants or Borrower Defendants, but who were guarantors of the Wells Fargo loans. These Defendants received a reduction in the amount of their guarantees by $2,035,366 due to the theft of PHG Jacksonville's funds. This category of Defendants includes NRCT,

3

LLC, Nilhan Developers, Niloy & Rohan, LLC, DCT Systems Group, LLC, Sugarloaf
Centre, LLC, and Bay Circle Properties, LLC. This third category of Defendants shall be
collectively referred to as the Guarantor Defendants.

10.     The fourth category includes only one Defendant: Wells Fargo Bank, NA
("Wells Fargo"). Wells Fargo was transferred $2,035,366 from the hotel deal belonging
to PHG Jacksonville to pay down the Wells Fargo loans. The transfer is voidable under
the Georgia Uniform Fraudulent Transfer Act ("UFTA"), because it was pursuant to a
fraudulent guarantee and transfer, in bad faith, and without equivalent value.

### Summary of Claims

11.     PHGII and the Hotel Deal Defendants created PHG Jacksonville to invest
in and purchase a Fairfield Inn & Suites hotel (the "Hotel") in Jacksonville, Florida. After
purchasing the Hotel in 2010, PHG Jacksonville entered into an agreement to sell the Hotel
to Embarc in 2012. To enable Embarc to make the purchase, PHG Jacksonville and Hotel
Deal Defendants agreed to provide seller financing and entered into a loan participation
agreement (the "Participation Agreement") whereby PHG Jacksonville and Hotel Deal
Defendants agreed (1) to loan Embarc certain monies to purchase the Hotel, and (2) share
the profits and proceeds from Embarc's loan repayment.

12.     Embarc made final loan repayment by two wire payments on or about May
29, 2014, which resulted in substantial profits from the Hotel investment. Embarc paid
over $4.3 million to Hotel Deal Defendants as the loan's final principal and interest
repayments. Rather than pay PHG Jacksonville its $2,035,366 share of the principal and
interest proceeds, Hotel Deal Defendants converted those funds for their own purposes.

4

13. After converting PHG Jacksonville's funds, the Hotel Deal Defendants transferred the funds to Wells Fargo bank to partially pay down two loans of over $25 million to Chittranjan Thakkar and the Borrower Defendants. These two loans included (1) over $10 million owed to Wells Fargo in outstanding personal loans to Defendants Chittranjan Thakkar and Saloni Thakkar; and (2) over $15 million owed to Wells Fargo in outstanding loans to Niloy, Inc. and Nilhan Financial, LLC. The Guarantor Defendants, who guaranteed both Wells Fargo loans, benefited from this stolen money, by reducing the amounts of their guarantees. Wells Fargo knew or should have known that the transfer of funds to pay down the loans was a fraudulent transfer.

## PARTIES

14. Plaintiff PHGII is a limited liability company organized under the laws of Georgia with its principal place of business located at 5607 Glenridge Drive, Suite 430, Atlanta, GA 30342.

15. PHG Jacksonville is a limited liability company organized under the laws of Georgia with its principal place of business located at 5607 Glenridge Drive, Suite 430, Atlanta, GA 30342.

16. Defendant JAX Hotel is a limited liability company organized under the laws of Florida with its principal place of business located at 5875 Peachtree Industrial Boulevard, Suite 340, Norcross, Georgia 30092. JAX Hotel may be served through its registered agent, Niloy Thakkar.

17. Defendant JAX Financial is a limited liability company organized under the laws of Florida with its principal place of business located at 5875 Peachtree Industrial

Boulevard, Suite 340, Norcross, Georgia 30092. JAX Financial may be served through its registered agent, Niloy Thakkar.

18.     Defendant Chittranjan K. Thakkar is a resident of Fulton County, Georgia, and may be served at 9350 Colonnade Trail, Alpharetta, Georgia 30022.

19.     Defendant Niloy Thakkar is a resident of Florida and may be served at 17885 Collins Avenue, Unit 4001, Sunny Isles Beach, FL 33160. Niloy Thakkar has transacted business in Georgia and in Fulton County.

20.     Defendant Rohan Thakkar is a resident of Florida and may be served at 17885 Collins Avenue, Unit 4001, Sunny Isles Beach, FL 33160. Rohan Thakkar has transacted business in Georgia and in Fulton County. Niloy Thakkar and Rohan Thakkar are the sons of Chittranjan Thakkar.

21.     Defendant Nilhan Financial, LLC ("Nilhan Financial") is a limited liability company organized under the laws of Georgia with its principal place of business located at 5875 Peachtree Industrial Boulevard, Suite 340, Norcross, Georgia 30092. Nilhan may be served through its registered agent, Chittranjan Thakkar.

22.     Defendant NRCT, LLC ("NRCT") is a limited liability company organized under the laws of Georgia with its principal place of business located at 5875 Peachtree Industrial Boulevard, Suite 340, Norcross, Georgia 30092. NRCT may be served through its registered agent, Chittranjan Thakkar at 6050 Peachtree Industrial Boulevard, Norcross, Georgia 30071.

23.     Defendant Niloy & Rohan, LLC ("Niloy & Rohan") is a limited liability company organized under the laws of Georgia with its principal place of business located

at 6050 Peachtree Industrial Boulevard, Norcross, Georgia 30071. Niloy & Rohan may be served through its registered agent, Chittranjan Thakkar.

24.     Defendant DCT Systems Group, LLC ("DCT Systems") is a limited liability company organized under the laws of Georgia with its principal place of business located at 6050 Peachtree Industrial Boulevard, Norcross, Georgia 30071. DCT Systems may be served through its registered agent, Chittranjan Thakkar.

25.     Defendant Nilhan Developers, LLC ("Nilhan Developers") is a limited liability company organized under the laws of Georgia with its principal place of business located at 6050 Peachtree Industrial Boulevard, Norcross, Georgia 30071. Nilhan Developers may be served through its registered agent, Chittranjan Thakkar.

26.     Defendant Sugarloaf Centre, LLC ("Sugarloaf") is a limited liability company organized under the laws of Georgia with its principal place of business located at 6050 Peachtree Industrial Boulevard, Norcross, Georgia 30071. Sugarloaf may be served through its registered agent, Niloy Thakkar.

27.     Defendant Bay Circle Properties, LLC ("Bay Circle") is a foreign limited liability company organized under the laws of Florida with its principal place of business located at 17885 Collins Avenue, Unit 4001, Sunny Isles Beach, Florida 33160. Bay Circle has transacted business in Georgia. Bay Circle may be served through its registered agent, Chittranjan Thakkar.

28.     Defendant Saloni Thakkar is a resident of Georgia and the wife of Chittranjan Thakkar. Saloni Thakkar may be served at 9350 Colonnade Trail, Alpharetta, Georgia 30022 in Fulton County.

29.    Defendant Wells Fargo is a foreign corporation organized under the laws of California with its principal place of business located at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104. Wells Fargo may be served through its registered agent, Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

30.    Each of the 9 limited liability company Defendants is owned in part and controlled by Chittranjan Thakkar, Niloy Thakkar, and/or Rohan Thakkar. Chittranjan Thakkar, Niloy Thakkar, and Rohan Thakkar utilized each of the 9 limited liability Defendants as alter egos.

## JURISDICTION

31.    This Court has jurisdiction of the subject matter of this case.

32.    Defendants are subject to personal jurisdiction in this Court.

33.    This Court has personal jurisdiction over nonresident Defendants under O.C.G.A. §9-10-91(1) because all Defendants have transacted business within this state.

## VENUE

34.    Venue is proper as to Defendants Chittranjan Thakkar and Saloni Thakkar because they reside in Fulton County.

35.    Venue is proper because all Defendants are joint tortfeasors. GA. CONST. Art. 6, §2, ¶ IV.

36.    The claims against the Hotel Deal Defendants arise in part from the Participation Agreement, which provides an exclusive venue of Fulton County, Georgia.

## FACTS

37.    PHG Jacksonville is a Georgia limited liability company that was created to purchase and sell the Hotel.

**I.    PHG Jacksonville is formed by PHGII and JAX Hotel, Chittranjan Thakkar, Niloy Thakkar, and Rohan Thakkar for the purpose of purchasing the Hotel.**

38.    On or about September 30, 2010, PHGII and Defendant JAX Hotel entered into a written operating agreement for the formation of PHG Jacksonville as a limited liability company.

39.    A true, correct and authentic copy of PHG Jacksonville's operating agreement (the "Operating Agreement") is attached as Exhibit A.

40.    Defendant Chittranjan Thakkar executed the Operating Agreement as manager on behalf of JAX Hotel.  Defendants Niloy Thakkar and Rohan Thakkar were the sole owners and members of JAX Hotel.  Niloy Thakkar, Rohan Thakkar, and Chittranjan Thakkar are the managers of JAX Hotel.

41.    The Operating Agreement, at §5.1.1 provided that PHGII and JAX Hotel each were managers of PHG Jacksonville.

42.    As managers of PHG Jacksonville, PHGII and JAX Hotel each were agents of PHG Jacksonville under Georgia law. O.C.G.A. §14-11-301(b)(2).

43.    As managers of PHG Jacksonville, PHGII and JAX Hotel each had duties to act in good faith, and each had fiduciary duties to PHG Jacksonville and its members. O.C.G.A. §14-11-305(1) and (4).

9

44.    The Operating Agreement provided that PHGII owned 33 1/3% of PHG Jacksonville, and JAX Hotel owned 66 2/3%.

45.    The Operating Agreement also provided that profits were to be shared between the members according to the percentages.

46.    On September 28, 2010, Defendants Niloy Thakkar and Rohan Thakkar formed Defendant JAX Financial. Defendants Niloy Thakkar and Rohan Thakkar each owned 50% of JAX Financial. Niloy Thakkar, Rohan Thakkar, and Chittranjan Thakkar are managers of JAX Financial.

47.    On September 30, 2010, JAX Financial loaned PHG Jacksonville $2,180,884.78, which PHG Jacksonville used to purchase the Hotel.

48.    At all times relevant to this action, Defendants JAX Hotel and JAX Financial were owned, controlled, and managed by Chittranjan Thakkar, Niloy Thakkar, and Rohan Thakkar.

**II.    PHG Jacksonville sold the Hotel to Embarc and participated in loaning Embarc the money for Embarc to complete the purchase.**

49.    On May 15, 2012, PHG Jacksonville sold the Hotel to Embarc for $4,072,000.00 (the "Hotel Sale").

50.    As part of the sale, PHG Jacksonville agreed to participate with JAX Financial in financing the sale. The financing was to be in the form of a loan of $4,072,000 by JAX Financial to Embarc, with PHG Jacksonville having a right to a share of the loan repayment proceeds. The terms of the loan participation were set by the Participation Agreement, entered by JAX Financial and PHG Jacksonville.

51.     The Participation Agreement has a venue selection clause of Fulton County, Georgia.

52.     PHGII and Defendant JAX Hotel executed the First Amendment to the Operating Agreement (the "Amendment")[1] for the purpose of agreeing that PHG Jacksonville enter the Participation Agreement.

53.     A true, correct, and authentic copy of the Amendment is attached as Exhibit B.  The PHG Jacksonville Operating Agreement, as amended, shall hereafter be referred to as the "Amended Operating Agreement."

54.     PHGII executed the Amendment and approved PHG Jacksonville entering into the Participation Agreement based on a number of representations and warranties by Defendants, including the representations and warranties in the Participation Agreement that JAX Financial had good title to and full right, power and authority to convey to PHG Jacksonville a participation interest free and clear of any liens, security interests or encumbrances.

55.     PHGII agreed to the Participation Agreement in reliance on JAX Financial's representation and warranty in the Participation Agreement that JAX Financial had good, unencumbered title to the loan proceeds.

**III.    The Participation Agreement required JAX Financial to pay PHG Jacksonville from the loan repayment proceeds.**

56.     A true, correct and authentic copy of the Participation Agreement is attached as Exhibit C.

---

[1] The term "Operating Agreement" shall hereafter refer to the Operating Agreement as amended.

57.    The Participation Agreement acknowledges that JAX Financial executed and delivered the Participation Agreement in Georgia.

58.    The Participation Agreement was executed by Defendant Chittranjan Thakkar as Manager of both JAX Financial and PHG Jacksonville.

59.    The Participation Agreement provided that JAX Financial's interest in the Embarc loan was 53.044%. PHG Jacksonville's interest was 46.956 %.

60.    The Participation Agreement provided that JAX Financial would receive the loan payments from Embarc and report to PHG Jacksonville all amounts collected in accrued interest, principal payments, and payments other than principal amounts. Ex. C, Participation Agreement at §6.

61.    The Participation Agreement required JAX Financial to "promptly" pay PHG Jacksonville its share of the loan payments.

62.    In the Participation Agreement, JAX Financial warranted as follows:

JAX Financial hereby represents and warrants to Participating Lender that JAX Financial has good titled to and full right, power and authority to convey to [PHG Jacksonville] the Participation Interest free and clear of any and all liens, security interests and encumbrances created by JAX Financial.

Participation Agreement, §11. This representation and warranty by JAX Financial was knowingly false, made for the purpose of inducing PHG Jacksonville to act, and was relied upon by PHG Jacksonville to its detriment.

**IV.   The Hotel Deal Defendants unlawfully converted approximately $2,035,366 that is due to PHG Jacksonville under the Participation Agreement.**

63.    From May 2012 through May 2014, Embarc made loan interest payments to JAX Financial.

64.    On or about May 29, 2014, JAX Financial received two wire payments from
Embarc to satisfy all amounts due under the loan.  One of the wire payments was for the
principal owed on the loan in the amount of $4,072,000.  Although required to do so by §6
of the Participation Agreement, JAX Financial has refused to remit payment to PHG
Jacksonville of its share of the principal amount.  PHG Jacksonville's share of the principal
amount is at minimum $1,852,026, of which at minimum $676,285 belongs to PHGII.

65.    The other wire payment to JAX Financial from Embarc on or about May 29,
2014 was for an amount that is still unknown to PHG Jacksonville because JAX Financial
breached its duties under the Participation Agreement to report the amount of the payment.
From the final payment received by Defendant JAX Financial for the accrued interest, PHG
Jacksonville is owed at minimum $183,340, of which it has not received.

66.    Defendants have converted for their own use the $2,035,366 which was PHG
Jacksonville's share of principal and interest payments received from Embarc.

67.    After learning that Embarc had repaid the loan to JAX Financial and not
having received its portion of the owed funds, PHGII's Chief Investment Officer Jatin
Desai telephoned Defendants and spoke to each of Chittranjan Thakkar and Niloy Thakkar
on or about June 19, 2014.  PHGII's CIO demanded payment and explained how proceeds
were to be distributed.  Neither Chittranjan Thakkar nor Niloy Thakkar disputed the
amounts owed.  Both Chittranjan Thakkar and Niloy Thakkar stated that payment would
be forthcoming.

68.    On or about June 25, 2014, PHGII's CIO Desai wrote to Defendant
Chittranjan Thakkar again demanding payment and outlining how the funds were to be

13

distributed according to the Participation Agreement and the Amended Operating Agreement.

69.     On or about July 25, 2014 and continuing for a period of several weeks thereafter, the CIO provided additional backup information documenting that JAX Financial should have over $4 million funds from which to pay PHG Jacksonville and PHGII.

70.     Defendants never disputed PHGII's calculations of the amount that was due to PHG Jacksonville and PHGII. Rather, Defendants requested additional time to analyze the amounts due, and to pay the funds owed.

71.     On August 8 and 19, 2014, Defendant Chittranjan Thakkar claimed that, contrary to the express warranty in the Participation Agreement, the Hotel Deal Defendants had pledged the Embarc loan proceeds as collateral for obligations to Wells Fargo unrelated to PHGII or the Hotel.

72.     Chittranjan Thakkar claimed that Wells Fargo thus had swept up (and seized) the Embarc loan proceeds as collateral. Defendant Chittranjan Thakkar promised that the funds due PHG Jacksonville and PHGII would be forwarded in 60 to 120 days when Chittranjan Thakkar expected to receive proceeds from an anticipated unrelated sale of a Virginia shopping center.

73.     Defendant Chittranjan Thakkar's representation was false. The Embarc final loan payments had been sent by wire transfer to BB&T, and thus could not have been swept into a Wells Fargo account except by a separate transfer by the Hotel Deal Defendants to

14

Wells Fargo. Any such transfer was without authority and amounted to breach of contract and conversion by the Hotel Deal Defendants.

74.     From August 2014 until the present, the Hotel Deal Defendants made various assurances to pay the loan proceeds owed to PHG Jacksonville and PHGII, but Defendants have failed to do so.

75.     On October 14, 2014, Defendant Chittranjan Thakkar acknowledged in an email that he owed PHG Jacksonville funds from which PHGII is owed approximately $700,000. Defendant Chittranjan Thakkar, through the email, admits the substantial amounts owed to PHG Jacksonville and PHGII, but the funds have not been paid.

**V.    PHG Jacksonville's funds were converted by the Hotel Deal Defendants and transferred to Wells Fargo to pay down personal and other loans.**

76.     The Hotel Deal Defendants concealed from PHG Jacksonville that they had illegally transferred to Wells Fargo the $2,035,366 owed to PHG Jacksonville for the purpose of paying down two loans (hereafter "the Wells Fargo Loans"). These Wells Fargo Loans totaled over $25 million loaned to the following:

- Defendant Chittranjan Thakkar;
- Defendant Saloni Thakkar;
- Defendant Niloy, Inc. (owned in part by Defendants Niloy and Rohan Thakkar or their trusts); and
- Defendant Nilhan Financial, LLC (owned by Niloy and Rohan Thakkar)

77.     The Embarc loan proceeds belonging to PHG Jacksonville were thus used to pay down personal loans of Chittranjan Thakkar and his wife, Saloni Thakkar. These personal loans were in default with over $10 million outstanding. Chittranjan Thakkar and

his wife directly benefited from the conversion of funds belonging to PHG Jacksonville, because those funds were used to pay down their loans to Wells Fargo.

78.     The Embarc loan proceeds belonging to PHG Jacksonville were also used to pay down loans to Niloy, Inc. and Nilhan Financial. Niloy, Inc. and Nilhan Financial borrowed from and owed Wells Fargo over $15 million under the Wells Fargo Loans. Niloy Thakkar and Rohan Thakkar are members and owners of Nilhan Financial. Niloy Thakkar and Rohan Thakkar, individually or through trusts, are part owners of Niloy, Inc.

79.     In addition to the borrowers, the following entities were guarantors on the Wells Fargo Loans and thus benefited from the illegal conversion by the Hotel Deal Defendants and transfer of funds to Wells Fargo: NRCT, Nilhan Developers, Niloy & Rohan, DCT Systems, Sugarloaf, and Bay Circle.

80.     The Hotel Deal Defendants' transfer of Embarc's loan payoff proceeds to Wells Fargo is voidable under the UFTA, because it was based on a fraudulent guarantee and transfer, in bad faith, without equivalent value.

81.     JAX Financial is owned 100% by Niloy Thakkar and Rohan Thakkar, and none of JAX Financial, Niloy Thakkar, nor Rohan Thakkar were borrowers under the Wells Fargo Loans. None of JAX Financial, Niloy Thakkar, nor Rohan Thakkar received a reasonably equivalent value from the guarantee and transfers, and the guarantees and transfers therefore are voidable. Wells Fargo had actual and/or constructive knowledge of these facts.

82.     The use of the funds to benefit Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar, and Saloni Thakkar shows that this was a scheme to defraud PHG Jacksonville,

16

and that the alter ego allegations are valid. The transfer of funds to Wells Fargo for the benefit of the Defendants was never authorized by, or disclosed to, PHG Jacksonville or PHGII.

## VI.    Defendants submitted fraudulent IRS K-1 Schedules.

83.    Pursuant to paragraph 10.7 of the Operating Agreement, JAX Hotel is the tax matters partner of PHG Jacksonville.  JAX Hotel, through Chittranjan Thakkar, caused a fraudulent IRS K-1 schedule to be filed, which falsely shows that 2014 Embarc loan repayment proceeds had been paid, received, and/or distributed to PHG Jacksonville and PHGII.

## VII.   Defendants had long planned to steal the funds from PHGII.

84.    The Hotel Deal Defendants had long planned to steal from PHG Jacksonville by converting the Embarc loan proceeds to pay off the Wells Fargo loan.  On April 13, 2013, the Hotel Deal Defendants secretly caused guarantees to be executed by JAX Financial to secure the Wells Fargo Loans.  The Hotel Deal Defendants thus long ago planned to use the Embarc loan proceeds to pay down the personal loans for Chittranjan Thakkar and his wife Saloni Thakkar, and to pay down loans to entities owned by Niloy Thakkar and Rohan Thakkar, or their trusts.  This 2013 guarantee also shows Chittranjan Thakkar, Niloy Thakkar, and Rohan Thakkar disregarded the separateness of the legal entities of JAX Financial and JAX Hotel, and used the entities for their own personal benefit.

## VIII. Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar, JAX Hotel, and JAX Financial are alter egos.

85.     The Hotel Deal Defendants are alter egos.  Chittranjan Thakkar, Niloy Thakkar, and Rohan Thakkar have disregarded the separateness of the legal entities of JAX Hotel, and JAX Financial, and have commingled on an interchangeable or joint basis or confused the otherwise separate properties, records and control of Embarc loan proceeds.

86.     JAX Financial and JAX Hotel had no assets other than the Embarc loan repayment proceeds, and both entities are instrumentalities of Chittranjan Thakkar's, Niloy Thakkar's, and Rohan Thakkar's own affairs.  JAX Financial and JAX Hotel were created solely for the purpose of consummating the transactions relating to the Hotel.  There is such a unity of interest among the ownership and management of JAX Financial and JAX Hotel that the separate personalities of the entities and the owners and managers do not exist.

### COUNT I – Breach of the Participation Agreement
### (Against the Hotel Deal Defendants)

87.     Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

88.     The Participation Agreement was an agreement between PHG Jacksonville and JAX Financial to share in the Embarc loan repayment proceeds on a $4,070,000 loan. Of this amount, the Participation Agreement entitled PHG Jacksonville to 46.956% of the principal repayment amounting to $1,911,106.20.

89.    On May 29, 2014, Embarc repaid to JAX Financial the principal amount of the loan in the amount of $4,070,000. Of this principal repayment, JAX Financial was required under the Participation Agreement to pay PHG Jacksonville at minimum $1,852,026, which is net of certain fees owed to a mortgage broker pursuant to separate arrangement.

90.    On May 29, 2014, Embarc also paid to JAX Financial interest on the loan of approximately $390,235 as the loan's final accrued interest repayment. Of this amount, PHG Jacksonville was owed at minimum $183,340 under the Participation Agreement.

91.    The total amount owed to PHG Jacksonville under the Participation Agreement from the May 29, 2014 Embarc loan repayments was at minimum $2,035,366.

92.    JAX Financial refused to and has failed to make the payments to PHG Jacksonville required under the Participation Agreement.

93.    Instead, Defendants Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar and JAX Hotel acting individually and as alter egos of JAX Financial, caused JAX Financial to breach the Participation Agreement and to pay Wells Fargo the money that instead should have been paid to PHG Jacksonville.

94.    As a result of these breaches, PHG Jacksonville and PHGII suffered damage.

95.    PHG Jacksonville has complied fully with its contractual obligations under the Participation Agreement.

96.    The Hotel Deal Defendants' failure to pay PHG Jacksonville the amounts owed is in bad faith, constitutes stubborn litigiousness, and has caused PHG Jacksonville unnecessary trouble and expense, thereby entitling PHG Jacksonville to recover its

19

expenses of litigation, including reasonable attorneys' fees and costs pursuant to O.C.G.A.

§13-6-11.

### COUNT II – Breach of the Amended Operating Agreement
### (Against the Hotel Deal Defendants)

97.    Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and

incorporates herein by reference the allegations set forth in the preceding paragraphs as if

fully restated herein.

98.    PHG Jacksonville and PHGII have complied with all terms of the Amended

Operating Agreement.

99.    JAX Hotel, through its alter egos Chittranjan Thakkar, Niloy Thakkar, Rohan

Thakkar and JAX Financial, received all of the funds owed to PHG Jacksonville under the

Participation Agreement.  The Hotel Deal Defendants failed to pay the funds owed to

PHGII as required by §4.3.1.2 of the Operating Agreement.

100.    Payment of the Embarc loan repayment proceeds to Wells Fargo operated as

a wrongful distribution leaving PHG Jacksonville insolvent and unable to pay its

obligations to PHGII.

101.    The failure of the Hotel Deal Defendants to pay PHG Jacksonville the

amounts owed under the Amended Operating Agreement is a breach of the Agreement by

JAX Hotel and its alter ego Defendants, and an improper distribution.

102.    PHG Jacksonville has been damaged and has complied fully with all of its

contractual obligations and all conditions precedent to Defendants' obligations to comply

with the Amended Operating Agreement.

## COUNT III – Conversion
### (Against the Hotel Deal Defendants, Borrower Defendants (except Saloni Thakkar), and Guarantor Defendants)

103.    Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

104.    The Hotel Deal Defendants wrongfully converted the Embarc loan proceeds owed to PHG Jacksonville.

105.    The Hotel Deal Defendants, Borrower Defendants (except for Saloni Thakkar), and Guarantor Defendants conspired together to convert the Embarc loan proceeds owed to PHG Jacksonville.

106.    These Defendants, in conspiracy with each other and acting through Chittranjan Thakkar, have without authorization assumed and exercised rights of ownership over money belonging to PHG Jacksonville, in hostility to PHG Jacksonville's rights, and have appropriated funds belonging to PHG Jacksonville without authorization.

107.    As a result of the foregoing, PHG Jacksonville has been damaged in an amount to be proven at trial, including attorneys' fees and prejudgment interest.

108.    In addition, Defendants' conduct as alleged herein constitutes willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which would raise the presumption of conscious indifference to consequences. Defendants' conduct was undertaken with the specific intent to cause harm to PHG Jacksonville. Accordingly, PHG Jacksonville also is entitled to recovery punitive damages without statutory limitation.

### COUNT IV – Breach of Fiduciary Duty
### (Against the Hotel Deal Defendants)

109.    Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

110.    Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar, JAX Hotel, and JAX Financial had a special relationship with PHG Jacksonville, and owed the duty of loyalty and fiduciary duties to PHG Jacksonville. Those duties required them to disclose the loan repayments received from Embarc, and to pay PHG Jacksonville its proper share.

111.    Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar, JAX Hotel, and JAX Financial breached those fiduciary duties by engaging in the wrongful acts described above.

112.    As a direct and proximate result of those Defendants' wrongful conduct, PHG Jacksonville has suffered damages.

113.    As a result, PHG Jacksonville is entitled to compensatory damages in an amount to be proven at trial, including attorneys' fees and prejudgment interest.

114.    Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar, JAX Hotel, and JAX Financial's conduct as alleged herein constitutes willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which would raise the presumption of conscious indifference to consequences. Defendants' conduct was undertaken with the specific intent to cause harm to PHG Jacksonville. Accordingly, PHG Jacksonville is also entitled to recovery punitive damages without statutory limitation.

### COUNT V – Constructive Fraud
### (Against the Hotel Deal Defendants)

115.    Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

116.    Each of Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar, JAX Financial, and JAX Hotel had fiduciary duties to PHG Jacksonville, the duties of good faith and to act in the best interests of PHG Jacksonville, and the duty to refrain from willful misconduct in relation to the interests of PHG Jacksonville and PHGII.

117.    By conspiring to transfer, and transferring to Wells Fargo the Embarc loan proceeds, Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar, JAX Financial, and JAX Hotel willfully acted contrary to their legal and equitable duties, trust and confidence justly reposed.

118.    The transfer of the Embarc loan proceeds belonging to PHG Jacksonville is contrary to good conscience and operates to the injury of PHG Jacksonville and PHGII.

119.    The transfer of the Embarc loan proceeds was willful misconduct by Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar, JAX Financial, and JAX Hotel.

120.    PHG Jacksonville was damaged by the constructive fraud.

### COUNT VI – Unjust Enrichment
### (Against All Defendants)

121.    Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

23

122.   Hotel Deal Defendants, Borrower Defendants, and Guarantor Defendants conspired together to misappropriate and convert the Embarc loan proceeds so as to deprive PHG Jacksonville of funds to which it is legally entitled.

123.   Such conduct was intended to, and in fact did, have the effect of permitting those Defendants to keep PHG Jacksonville's funds that did not belong to Defendants.

124.   Hotel Deal Defendants, Borrower Defendants, and Guarantor Defendants knowingly accepted the benefit of the Embarc proceeds belonging to PHG Jacksonville, and had knowledge that the Embarc proceeds belonged to PHG Jacksonville.

125.   Wells Fargo accepted the benefit of the Embarc proceeds so as to deprive PHG Jacksonville of funds to which it is legally entitled.

126.   Under the circumstances, Defendants have been unjustly enriched at the expense of PHG Jacksonville. Therefore, this Court should order Defendants to repay PHG Jacksonville, disgorge all funds unlawfully retained by Defendants, and return to PHG Jacksonville the full amounts belonging to PHG Jacksonville.

## COUNT VII – Avoidance of Fraudulent Transfers under O.C.G.A. §18-2-75(a)
### (Against All Defendants)

127.   Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

128.   PHG Jacksonville's claims against JAX Financial for the Embarc loan proceeds arose before JAX Financial fraudulently transferred the loan proceeds to Wells Fargo.

24

129.   JAX Financial guaranteed the Wells Fargo loan without receiving any value in exchange for the guarantee.  In the alternative, JAX Financial guaranteed the Wells Fargo loan without receiving reasonably equivalent value.

130.   JAX Financial transferred at minimum $2,035,366 of the Embarc loan proceeds belonging to PHG Jacksonville to Wells Fargo to pay down the loans to Chittranjan Thakkar, Saloni Thakkar, Niloy, Inc., and Nilhan Financial, LLC.  JAX Financial received no value in exchange for the transfer.  In the alternative, JAX Financial made the transfer without receiving reasonably equivalent value.

131.   When JAX Financial made the fraudulent transfer, it was insolvent. Alternatively, JAX Financial was rendered insolvent as a result of the fraudulent transfer.

132.   Wells Fargo knew or should have known that the transfer of Embarc loan proceeds was in bad faith because among other reasons, there was no equivalent value provided to JAX Financial for the transfer of such large sums.

133.   As a result of the conversion, breach of contract, and fraudulent transfer, PHG Jacksonville is entitled to the entry of an order setting aside the fraudulent transfer of Embarc loan proceeds to Wells Fargo in its entirety and re-vesting or paying the proceeds to PHG Jacksonville.

**COUNT VIII – Damages under Uniform Fraudulent Transfers Act, O.C.G.A. §18-
2-70 *et seq.*
(Against All Defendants)**

134.   Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein

25

135.    Through their respective actions in transferring and receiving funds belonging to PHG Jacksonville with actual intent to hinder, delay, or defraud JAX Financial's creditor PHG Jacksonville, Defendants have violated the UFTA, proximately caused damage to PHG Jacksonville, and are liable to PHG Jacksonville for damages and other relief in an amount to be proven at trial not less than $2,035,366 (plus attorneys' fees and interest).

136.    Through their respective actions in transferring and receiving assets of JAX Financial without receiving a reasonably equivalent value in exchange for the transfers, and while intending to incur or reasonably believing that JAX Financial would incur debts beyond JAX Financial's ability to pay as such debts became due, Defendants have violated the UFTA, proximately caused damage to PHG Jacksonville, and are liable to PHG Jacksonville for damages and other relief to be proven at trial not less than $2,035,366 (plus attorneys' fees and interest).

## COUNT IX – Wrongful Distribution
### (Against the Hotel Deal Defendants)

137.    Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

138.    The Hotel Deal Defendants conspired to distribute the entire Embarc Loan proceeds to Chittranjan Thakkar, Niloy Thakkar, Rohan Thakkar, JAX Financial, and JAX Hotel to pay down the Wells Fargo Loans.

26

139.   This distribution rendered the PHG Jacksonville insolvent and with total assets less than the sum of its total liabilities.  PHG Jacksonville is unable to pay PHGII the moneys owed to it in the usual course of its business.

140.   The distribution of funds to the Hotel Deal Defendants was wrongful and prohibited by O.C.G.A. §§14-11-407, 408.

### COUNT X - Pre-Judgment Attachment
### (Property owned by Defendants and deeded to secure the Wells Fargo Loans)

141.   Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein

142.   The wrongful distribution and fraudulent transfer of the Embarc loan proceeds was for the purpose of paying down loans guaranteed by properties pledged by Defendants to secure the Wells Fargo Loans.  These properties are identified in the following deeds to secure debt to Wells Fargo or its predecessors:

    a.   Deed to Secure Debt, Assignment of Rents and Security Agreement dates on or about July 20, 2010, made by Saloni C. Thakkar and Chittranjan Thakkar in favor of Wells Fargo, recorded on or about July 30, 2010, at Deed Book 50190, Page 2, Records of Gwinnett County, Georgia.

    b.   Deed to Secure Debt, Assignment of Rents and Security Agreement dates on or about August 15, 2008, made by Nilhan Developers, LLC in

favor of Wells Fargo recorded on or about August 19, 2008, at Deed

Book 14632, Page 1590, Records of Cobb County, Georgia.

c. Deed to Secure Debt, Assignment of Rents and Security Agreement

dates on or about July 20, 2010, made by DCT Systems Group, LLC, in

favor of Wells Fargo, recorded on or about July 30, 2010, at Deed Book

50190, Page 46, Records of Gwinnett County, Georgia.

d. Deed to Secure Debt, Assignment of Rents and Security Agreement

dates on or about August 15, 2008, made by Sugarloaf Centre, LLC, in

favor of Wells Fargo, recorded on or about August 19, 2008, at Deed

Book 49032, Page 751, Records of Gwinnett County, Georgia.

e. Deed to Secure Debt, Assignment of Rents and Security Agreement

dates on or about April 30, 2013, made by NRCT, LLC, in favor of

Lender, recorded on or about May 13, 2013, at Deed Book 52221, Page

218, Records of Gwinnett County, Georgia.

143. JAX Financial, Chittranjan Thakkar, Niloy Thakkar, and Rohan Thakkar fraudulently transferred the Embarc loan proceeds to Wells Fargo to pay down the debts secured by the properties identified in the preceding paragraph, and owned by the Defendants.

144. The debt on each of the properties owned by Defendants was thereby reduced by the fraudulent transfer of the Embarc loan proceeds belonging to PHG Jacksonville.

28

145.   As a result of the fraudulent transfer to pay loans guaranteed by the properties, PHG Jacksonville is entitled to the entry of a pre-judgment attachment against each of the properties pledged to secure the debt.

### COUNT XI – Money Had and Received
### (Against All Defendants)

146.   Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

147.   The Hotel Deal Defendants, Borrower Defendants, Guarantor Defendants, and Wells Fargo received and possess money rightfully belonging to PHG Jacksonville.

148.   Equity and good conscience require that they should not be permitted to keep the money belonging to PHG Jacksonville.

149.   Plaintiff, on behalf of PHG Jacksonville, has demanded repayment.

150.   The demand for repayment was refused.

### COUNT XII – Constructive Trust
### (Against Wells Fargo)

151.   Plaintiff, derivatively on behalf of PHG Jacksonville, realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

152.   Wells Fargo holds title to PHG Jacksonville's funds due to fraud, conversion, and breach of contract, such that PHG Jacksonville cannot enjoy the beneficial interest of the property without violating principals of equity.

29

153.   As such, the Court should impose a constructive trust on such funds, wherever they may be, for the benefit of PHG Jacksonville and pursuant to O.C.G.A. §53-12-132.

### COUNT XIII – Specific Performance
### (Against the Hotel Deal Defendants)

154.   PHG Jacksonville repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully restated herein.

155.   The Participation Agreement required that JAX Financial report to PHG Jacksonville the amount of all payments (interest payments, principal payments, and other payments) that it received from Embarc. Ex. C, §6.   Defendants have breached that requirement of the Participation Agreement.

156.   The Participation Agreement required JAX Financial to promptly remit any such payments to PHG Jacksonville. *Id.*   Defendants have breached that requirement of the Participation Agreement.

157.   The Participation Agreement expressly provides that PHG Jacksonville shall have a right to enforce the Participation Agreement through specific performance.

158.   Accordingly, Plaintiff, derivatively and on behalf of PHG Jacksonville, requests that the Court issue a mandatory injunction requiring Defendants identify all Embarc loan payments received, and pay PHG Jacksonville its share of those loan payments under the terms of the Participation Agreement.

## Prayer for Relief

Plaintiff, derivatively on behalf of PHG Jacksonville, demands a jury trial and judgment and other relief as follows:

A.    Judgment for all damages and punitive damages allowed by law as determined by the enlightened conscience of the jury;

B.    Prejudgment interest as allowed by law;

C.    Specific performance under the Participation Agreement and Amended Operating Agreement, including payment of all funds owed, and identification of all funds received from Embarc;

D.    An Order avoiding the wrongful distributions and fraudulent transfers to the extent necessary to satisfy the judgment;

E.    An Order of pre-judgment attachment or other provisional remedy against the properties deeded to secure the Wells Fargo Loans paid down by Embarc loan proceeds belonging to PHG Jacksonville;

F.    Imposition of a constructive trust on the converted funds, wherever they may be;

G.    Judgment in an amount to be proven at trial that requires Defendant to disgorge any funds unlawfully retained and to return to PHG Jacksonville the full amount of its unjust enrichment and money had and received; and

H.    Such other relief as the Court deems just and proper.

This, the 21st day of September, 2015.

HALL & LAMPROS, LLP

Christopher B. Hall
Georgia Bar No. 318380
Andrew Lampros
Georgia Bar No. 432328
Promenade Two, Suite 950
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel.:  404 876-8100
Fax:  404 876-3477
chall@hallandlampros.com
alampros@hallandlampros.com

Attorneys for Plaintiff

## OPERATING AGREEMENT OF
## PHG JACKSONVILLE, LLC

**THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE GEORGIA SECURITIES ACT OF 1973, AS AMENDED, IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 10-5-9 (13) OF SUCH ACT. IN ADDITION, THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON AN EXEMPTION FROM SUCH REGISTRATION SET FORTH IN THE SECURITIES ACT OF 1933 PROVIDED BY SECTION 4(2) THEREOF, NOR HAVE THEY BEEN REGISTERED WITH THE SECURITIES COMMISSION OF CERTAIN STATES IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACTS.**

This Operating Agreement (this "Agreement") of PHG JACKSONVILLE, LLC, a Georgia limited liability company (the "Company"), effective as of September 30, 2010, by declaration of PEACHTREE HOTEL GROUP II, LLC, a Georgia limited liability company ("PHG"), and JAX FAIRFIELD HOTEL GROUP, LLC, a Florida limited liability company ("JAX").

### Statement of Background

The parties to this Agreement have caused to be formed the Company as a limited liability company under the Georgia Limited Liability Company Act and desire to make this agreement which shall be the "operating agreement" as that term is used in the Georgia Limited Liability Company Act. The parties to this Agreement are to be "members" of the limited liability company as that term is used in the Georgia Limited Liability Company Act and are hereinafter collectively referred to as the "Members".

### Statement of Agreement

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, agree as follows:

### Article I
### Defined Terms



**EXHIBIT**

**A**

The following capitalized terms shall have the meanings specified in this Article I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"*Act*" means the Georgia Limited Liability Company Act (O.C.G.A. Section 14-11-100 et seq.), as amended from time to time.

"*Acquisition Contract*" means that certain Sale and Assignment Agreement dated on or about September 21, 2010 by and between PHG Jacksonville, LLC and Seller with respect to the acquisition of the Loan Assets.

"*Adjusted Capital Account Deficit*" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)    the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to Section 4.4.2, or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii)    the deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

"*Adjusted Capital Balance*" means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections 4.1.1 and 4.4 (to the extent allocable thereto) hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

"*Affiliate*" means, with respect to any Member, any Person:    (i) in the case of an individual, any member of such Person's Family; (ii) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of any class of the voting securities of or equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

"*Agreement*" means this Operating Agreement, as amended from time to time.

"*Capital Account*" means the account maintained by the Company for each Interest Holder in accordance with the following provisions:

(i)    an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's distributive share of Profit and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to the provisions of Article IV (other than Section 4.3.3); and

2

(ii)    an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the amount of any liabilities of the Interest Holder assumed by the Company (or which are secured by property contributed by the Interest Holder to the Company), the Interest Holder's distributive share of Loss and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Article IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"*Capital Contribution*" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"*Capital Transaction*" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

"*Cause*" shall mean, with respect to a Member and any of its Affiliates, any of the following:

(a)    the commission of a felony or other criminal dishonesty or deliberate misconduct which, in the good faith opinion of the Manager, is injurious in a material respect to the financial condition or business reputation of the Company;

(b)    personal dishonesty, willful misconduct, breach of fiduciary duty involving personal profit, intentional failure to perform stated duties, or willful violation of any law, rule, regulation (other than traffic violations or similar offenses); or

(c)    uncured material breach of this Agreement or any other document, agreement or instrument related executed in connection with the transactions contemplated hereby.

"*Code*" means the United States Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"*Company*" means the limited liability company formed in accordance with this Agreement.

3

"*Conditions of Transfer*" means:

(a)    the Transfer will not require registration of Interests or Membership Rights under any federal or state securities laws;

(b)    the transferee delivers to the Company a written instrument agreeing to be bound by the terms of Section VI of this Agreement.

(c)    the Transfer will not result in the termination of the Company pursuant to Code Section 708;

(d)    the Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended; and

(e)    the transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the Transferred Interest.

"*Distributable Cash*" means all cash received by the Company from all sources, plus any cash that becomes available from reserves, less the sum of the following to the extent paid or set aside by the Company, in the Manager's reasonable discretion: (a) all cash applied to the acquisition of assets; (b) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders (other than Member Loans repaid pursuant to Section 4.1.1.1. below); (c) all cash expenditures incurred in the operation of the Company's business; and (d) all reserves reasonably necessary to provide for contingent liabilities of the Company or future cash requirements for operations.

"*Family*" means a Member's spouse, lineal ancestors or descendants by birth or adoption, siblings, and trusts for the exclusive benefit of a Member or any of the foregoing individuals.

"*Interest*" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"*Interest Holder*" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

"*Involuntary Withdrawal*" means, with respect to any Member, the occurrence of any of the following events:

(i) the Member makes an assignment for the benefit of creditors;

(ii) the Member files a voluntary petition of bankruptcy;

(iii) the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v) the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) the Member is party to a divorce proceeding or any similar proceeding affecting the marital status of Member that is commenced and is not dismissed by a court of competent jurisdiction with sixty (60) days from the date of commencement of such proceeding;

(vii) the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (vi);

(viii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, which continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for ninety (90) days or, if the appointment is stayed, for ninety (90) days after the expiration of the stay during which period the appointment is not vacated;

(ix) if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(x) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(xi) if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company, excluding an administrative dissolution by clerical error (e.g., failure to file an annual report), provided the applicable Member rectifies such matter as quickly as possible after becoming aware of same;

(xii) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

(xiii) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

(xiv) if the Member (or any of its Affiliates) commits any act or omits to commit any act constituting Cause.

"*Lender*" means JAX Fairfield Financial, LLC, a Florida limited liability company, and its successors and assigns.

5

"*Loan Assets*" means all of that certain loan secured by real property being identified by The Coastal Bank of Georgia, Loan Number 10901170-10, from Jacksonville Airport Hotels II, LLC, together with all documents evidencing, securing, or in any way relating to the aforesaid loans and all right, title and interest in and to any collateral securing or related thereto.

"*Manager*" and "*Managing Member*" means the Person or Persons designated as such in Article V.

"*Member*" means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

"*Member Loan Nonrecourse Deductions*" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

"*Membership Rights*" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

"*Minimum Gain*" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"*Negative Capital Account*" means a Capital Account with a balance of less than zero.

"*Nonrecourse Deductions*" has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

"*Nonrecourse Liability*" means any liability of the Company with respect to which no Member has personal liability determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

"*Percentage*" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"*Person*" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"*Positive Capital Account*" means a Capital Account with a balance greater than zero.

"*Prime Rate*" means the prime interest rate quoted or published from time to time by the Wall Street Journal. If the Wall Street Journal should abolish or abandon the practice of

6

publishing or quoting a prime interest rate, or should the same in the Manager's judgment become unascertainable, then the Manager, at its option, may designate an alternative index of interest rates comparable to the prime interest rate; and the rate determined pursuant to such alternative index shall, from and after the date on which the Wall Street Journal abolishes or abandons the practice of publishing or quoting a prime interest rate, or on which same become unascertainable (subject, however, to the resumption of the publication or quotation of the prime interest rate by the Wall Street Journal, in which case such rate shall be the interest rate hereunder, effective as of the date following such resumption), be the interest rate used in lieu of the Prime Rate.

"*Profit*" *and* "*Loss*" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i)    all items of income, gain, loss, or deduction, required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(ii)    any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(iii)    any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(iv)    gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(v)    in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi)    notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

"*Regulation*" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"*Seller*" means The Coastal Bank of Georgia, as seller under the Acquisition Contract.

"*Transfer*" means, when used as a noun, any voluntary or involuntary sale, hypothecation, pledge, assignment, attachment, or other disposition, and, when used as a verb, means, voluntarily or involuntarily to sell, hypothecate, pledge, assign, or otherwise dispose of, whether for consideration or gratuitously.

7

"*Voluntary Withdrawal*" means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

## Article II
## Formation and Name: Office; Purpose; Term

2.1.    *Organization.*  Effective with the filing of the Articles of Organization, the Company shall constitute a limited liability company formed pursuant to the Act and other applicable laws of the State of Georgia.  The Manager shall, when required, file such amendments to or restatements of the Articles of Organization, in such public offices in the State of Georgia or elsewhere as the Manager deems advisable to give effect to the provisions of this Agreement and the Articles of Organization, and to preserve the character of the Company as a limited liability company.

2.2.    *Name of the Company.*  The name of the Company shall be "PHG Jacksonville, LLC."  The Company may do business under that name and under any other name or names upon which the Manager selects.  If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file a trade name certificate as required by law.

2.3.    *Purpose.*  The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities:

(a)    To purchase, acquire, buy, sell, own, trade in, hold, manage, and otherwise deal in and with the Loan Assets, and to do any and all things necessary, convenient, or incidental to that purpose.

(b)    To exercise all powers enumerated in the Act incidental, necessary or appropriate to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

2.4.    *Term.*  The term of the Company shall commence with its formation under Section 2.1 and shall continue in perpetuity, unless its existence is sooner terminated pursuant to Article VII of this Agreement.

2.5.    *Principal Office.*  The principal office of the Company shall be located at: c/o Peachtree Hotel Group, Two Premier Plaza, Suite 430, Atlanta, Georgia 30342, Attn:  Greg Friedman, or at any other place within the State of Georgia upon which the Manager selects.

2.6.    *Registered Agent and Office.*  The name and address of the Company's registered agent in the State of Georgia shall be R. Lee Tucker, Jr., Mahaffey Pickens Tucker, LLP, 1550 North Brown Road, Suite 125, Lawrenceville, Georgia 30043.

2.7.    *Members.*  The name, present mailing address, taxpayer identification number, and Percentage of each Member are set forth on Exhibit A.

2.8.    *Representations by Members.*  Each Member represents, warrants, agrees and acknowledges that:

8

(a)    its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or any event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets are subject, or violate any statute or any order, rule or regulation of any court or governmental or regulatory agency, body or official, that would materially and adversely affect the performance of its duties hereunder; such Member has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by such Member of its obligations hereunder;

(b)    there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental agency or instrumentality that could adversely affect or would prohibit its entering into or performing its obligations under this Agreement;

(c)    this Agreement is a binding agreement on the part of such Member enforceable in accordance with its terms against such Member;

(d)    it is acquiring its Interest as a Member for its own account for investment purposes only and not with a view to the distribution or resale thereof in connection with any distribution or public offering thereof within the meaning of the Securities Act of 1933, as amended, or other applicable securities laws or rules, in whole or in part, and agrees that it will not transfer all or any part of its Membership Interest, or solicit offers to buy from or otherwise approach or negotiate in respect thereof with any Person whomsoever all or any portion of its Membership Interest, in any manner that would violate or cause the Company or any Member to violate applicable federal or state securities laws; and

(e)    it has been provided with, or has had access to, such information as it deems necessary to or useful in its evaluation of the merits, risks and tax consequences of an investment in the Company and of making an informed investment decision.

2.9.    *Other Activities of the Members.*

(a)    Each of the Members understands that the other party or its Affiliates may be interested, directly or indirectly, in various other businesses and undertakings not included in the Company. Each of the Members agrees that each Member shall have the right to have such other interests and activities and to receive and enjoy profits or compensation therefrom; that each party waives any rights it might otherwise have to share or participate in such other interests or activities of the other; that some of the other business interests, activities and investments of the parties may be in conflict or competition with the business of the Company; that each of the Members may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without limitation, owning, financing, acquiring, leasing, promoting, developing, improving, operating, managing and servicing real property; and that each Member may engage in any such activities, whether or not competitive with the Company, or to any other party, without any obligation to offer any interest in such activities to the Company; and that the pursuit of such activities, even if competitive with the business of the

9

Company, shall not be deemed wrongful or improper (including, without limitation, leasing space to tenants at locations not owned by the Company).

(b)    No Member or any other person employed by, related to or in any way affiliated with any Member shall have any duty or obligation to disclose or offer to any other Member, or obtain for the benefit of the other Member, any other activity or venture or interest therein.  No Member, nor any of their creditors or any other person having an interest in such Member shall have (i) any claim, right or cause of action against any other Member or any other person employed by, related to or in any way affiliated with, any other Member by reason of any direct or indirect investment or other participation, whether active or passive, in any such activity or interest therein, or (ii) any right to any such activity or interest therein or the income or profits derived therefrom.

### Article III
### Members; Capital; Capital Accounts

3.1.    *Initial Capital Contributions.*  Upon the execution of this Agreement, the Member shall contribute to the Company cash and Initial Member Loans in the amount set forth on Exhibit A, in order to allow the Company to acquire the Loan Assets from Lender.

3.2.    *Additional Capital Contributions.*

3.2.1.  No Member shall have any obligation to make any Capital Contribution in excess of its Initial Capital Contribution described in Section 3.1. If additional capital is determined by the Manager to be necessary and appropriate in connection with the acquisition and ownership of the Loan Assets, the conduct of the business of the Company or in order to pay taxes, insurance premiums, principal and interest on indebtedness of the Company or various other costs of the operation of the Company and ownership of the Loan Assets, including capital expenditures, then the Manager shall use its good faith, commercially reasonable efforts to obtain such capital from outside financing sources, including making additional draws from the Acquisition Loan.  If, after exhausting such efforts, additional capital is still needed, and provided that such request for additional Capital Contributions has been unanimously approved by the Members pursuant to Section 5.1.3 hereinbelow, the Members may make additional Capital Contributions, which additional Capital Contributions shall be payable in proportion to the respective Percentages of each of the Members and shall be payable within ten (10) days of written demand from the Managers.  If all Members do not make such Additional Capital Contributions on a timely basis, then the contributing Members may elect either to receive back the amount they contributed to the Company or alternatively, treat such amount as a loan to the Company (a "Member Loan") providing for interest and such other terms as set forth herein.  In addition, the contributing Members shall have the opportunity, but not the obligation, to loan such amounts to the Company that the noncontributing Members failed to contribute on a pro rata basis in accordance with their Percentages. Any opportunities to make such loans that are declined may be reoffered to the Members who have agreed to make such loans on a pro rata basis in proportion to their Percentages until the entire amount needed is loaned to the Company or said Members have declined to loan any remaining amount.  Such loans shall also be deemed to be Member Loans and shall provide for interest and such other terms as set forth below. Any such amounts which are not loaned or contributed to the Company by the Members may be

10

borrowed by the Company from third parties as determined by the Members. Any Member Loan made pursuant to this Section 3.2 shall bear interest a fixed rate determined as of the date of the loan equal to the greater of (i) the Prime Rate plus four percent (4%) per annum or (ii) fifteen percent (15%) per annum, but shall not exceed the maximum rate allowed by law; and shall be payable only out of Distributable Cash of the Company as provided in Article IV below or on liquidation of the Company. In the event there is more than one Member Loans outstanding at any time in which there is a distribution made under Sections 4.1.1 or 4.4, then amounts distributed under such Sections shall first be applied to repay the most recent Member Loans, and if more than one Member has made a Member Loan at the same time then as between the Members such Member Loans shall be repaid pro rata in proportion to the outstanding balance of such Member Loans (but still giving priority to the most recent Member Loan(s)).

3.2.2.  Except as otherwise expressly set forth herein, no Member shall have any personal liability, directly or indirectly, for any obligation of the Company whether in response to any call for additional Capital Contributions, by reason of any demand for contribution on account of any loan, guaranty, indemnity or other recourse obligation, including without limitation the Acquisition Loan, or otherwise.

3.3.  *No Interest on Capital Contributions.*  Interest Holders shall not be paid interest on their Capital Contributions.

3.4.  *Return of Capital Contributions.*  Except as otherwise provided in this Agreement and applicable law, no Interest Holder shall have the right to receive the return of any Capital Contribution.

3.5.  *Form of Return of Capital.*  If the Interest Holders are entitled to receive a return of any Capital Contribution, the Company may distribute cash, notes, property or a combination thereof to the Interest Holders in return thereof but solely with respect to notes or property in proportion to their respective Percentages unless otherwise agreed to unanimously by the Members.

3.6.  *Capital Accounts.*  A separate Capital Account shall be maintained for each Interest Holder.

3.7  Initial Member Loans.  Notwithstanding anything in Section 3.2 to the contrary, the Members have contributed funds to the Company which amounts are listed on Exhibit A (the "Initial Member Loans"), and are separate from Member Loans. The Initial Member Loans shall accrue interest at the Short Term Applicable Federal Rate, as established by the United States Internal Revenue Service (which Rate is .41% as of the date hereof), and the applicable principal and interest shall be paid by the Company to the respective Members on or before August 31, 2013.

## Article IV
### Profit, Loss, and Distributions

4.1.  *Statement of Background.*

11

4.1.1    The Company purchased the Loan Assets from Seller. Lender, an affiliate of JAX, has agreed to provide financing for the purchase of the Loan Assets by the Company in the form of the Bank Loan, as described below.

4.1.2    Lender has provided financing to the Company to fund a portion of the purchase of the Loan Assets as evidenced by a promissory note dated even date herewith in the original principal amount of $2,180,884.78 (the "Bank Loan"). The Company is making a contribution in the amount of $176,828.50 (together with any future contributions made by the Company, so long as such future contributions are made with the prior written consent of Lender (such consent not be unreasonably withheld, conditioned or delayed), the "Initial Capital Contribution") in the purchase of the Loan Assets.

4.2    *Distributions.*

4.2.1.    *Distributable Cash.* In the case where monthly operating cash flows generated by the Loan Assets exceed the monthly debt service on the Bank Loan, Distributable Cash shall be distributed by the Company to the Company and Members promptly following the end of the applicable fiscal quarter, as follows:

4.2.1.1    first, subject to Section 3.2.1, to pay any accrued but unpaid interest on, and then to pay the past due debt service, if any, of any loans, including the Bank Loan and Member Loans (excluding the Initial Member Loans, as defined on Exhibit A) made in accordance with Section 3.2.1 hereof; then

4.2.1.2    second, to pay any fees or past due amounts owed to any related or third parties, on discretion of the unanimous consent of Members; then

4.2.1.3    third, to the Members, to the extent any Member has made any additional Capital Contributions to the Company pursuant to Section 3.2 hereof, in proportion to such additional Capital Contributions, until each has received an amount of Distributable Cash equal to such Member's additional Capital Contributions made pursuant to Section 3.2 above; then

4.2.1.4    fourth, to the Interest Holders in proportion to their Adjusted Capital Balances, until each Interest Holder has received an amount of Distributable Cash equal to such Interest Holder's initial Capital Contributions actually made; then

4.2.1.5    fifth, thirty-three and 1/3 percent (33 1/3%) to PHG and sixty-six and 2/3 percent (66 2/3%) to JAX.

4.2.2    *Tax Distributions.* Notwithstanding anything to the contrary contained herein, to the extent Distributable Cash is on hand at the time thereof for the purposes set forth below, the Manager shall from time to time make a pro rata, based on the Percentage of each Member's Interest, priority distribution ("Tax Distribution") out of the Distributable Cash of the Company to the Members in order to provide a source of funds to pay any tax liability attributable to their Interests for such year. The amount of any such Tax Distributions shall be based generally on the highest combined federal and state income tax rate multiplied by the projected taxable income that will be allocated to the applicable Members. Such pro rata Tax

12

Distributions shall have priority over any other Distributions payable to the Members of the Company pursuant to this Agreement.

     4.2.3   *Distributions When Operating Cash Flow Equals or is Less Debt Service or in Capital Event.*  In the case where either (i) monthly operating cash flows generated by the Loan Assets is equal to or less than the monthly debt service on the Bank Loan, or (ii) upon a Capital Transaction, Distributable Cash shall be distributed by the Company to the Company, Members and Lender promptly following the end of the applicable fiscal quarter, as follows:

     4.2.3.1  first, one hundred percent (100%) to the Lender, until such time as the Bank Loan is paid in full; then

     4.2.3.2  second, to the Members until the Members have received one hundred percent (100%) of their respective Initial Capital Contribution; then

     4.2.3.3  third, subject to Section 3.2.1, to pay any accrued but unpaid interest on, and then to pay the unpaid principal balance, if any, of any and all Member Loans made in accordance with Section 3.2.1 hereof; then

     4.2.3.4  fourth, to the Members, to the extent any Member has made any additional Capital Contributions to the Company pursuant to Section 3.2 hereof, in proportion to such additional Capital Contributions, until each has received an amount of Distributable Cash equal to such Member's additional Capital Contributions made pursuant to Section 3.2 above; then

     4.2.3.5  fifth, to the Interest Holders in proportion to their Adjusted Capital Balances, until each Interest Holder has received an amount of Distributable Cash equal to such Interest Holder's initial Capital Contributions actually made; then

     4.2.3.6  sixth, thirty-three and 1/3 percent (33 1/3%) to PHG and sixty-six and 2/3 percent (66 2/3%) to JAX.

Any payments or distributions to a Member (except in the ordinary course of business), shall be in the form of a check and such check shall require the execution of all Members.  Members consent to a request to execute a check shall not be unreasonably, withheld, conditioned or delayed.

    4.3.   *Allocation of Profit or Loss.*

     4.3.1.  *Profit.*  After giving effect to the special allocations set forth in Section 4.4, Profit shall be allocated in the following order and priority:

     4.3.1.1.  First, if one or more Interest Holders has a Negative Capital Account, to those Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been reduced to zero.

13

4.3.1.2.  Second, any Profit not allocated pursuant to Section 4.3.1.1 shall be allocated to the Interest Holders in proportion to, and to the extent of, the amounts, if any, required to increase their Positive Capital Accounts to the amount distributable to them pursuant to Section 4.1.

4.3.1.3.  Finally, any Profit in excess of the foregoing allocations shall be allocated to the Interest Holders in proportion to their Percentages.

4.3.2.  *Loss.*  After giving effect to the special allocations set forth in Section 4.4, Loss shall be allocated in the following order and priority.

4.3.2.1.  First, if one or more Members has a Positive Capital Account in excess of their respective Adjusted Capital Balances, to those Members, in proportion and to the extent of the amounts by which their respective Positive Capital Accounts exceed their respective Adjusted Capital Balances.

4.3.2.2  Second, to the Members in proportion to and to the extent of their Positive Capital Accounts (after adjustment for allocations under 4.3.2.1) until all Positive Capital Accounts have been reduced to zero; and

4.3.2.3.  Finally, any remaining Loss shall be allocated to the Members in proportion to their Percentages.

4.4.    *Regulatory Allocations.*

4.4.1  *Qualified Income Offset.*  No Interest Holder shall be allocated Losses or deductions if the allocation causes an Interest Holder to have an Adjusted Capital Account Deficit.  If an Interest Holder receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible.  This Section 4.4.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.4.2.  *Minimum Gain Chargeback.*  Except as set forth in Regulation Section 1.704-2(f)(2), (3) and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Article IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g).  Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year.  It is the intent of the parties hereto that any allocation

14

pursuant to this Section 4.4.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

4.4.3.  *Contributed Property and Book-Ups.*  In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution).  If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

4.4.4.  *Code Section 754 Adjustment.*  To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.4.5.  *Nonrecourse Deductions.*  Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.4.6.  *Member Loan Nonrecourse Deductions.*  Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(b).

4.4.7.  *Guaranteed Payments.*  To the extent any compensation paid to any Interest Holder by the Company, including any fees payable to any Interest Holder pursuant to Section 5.3 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Interest Holder other than in the Person's capacity as an Interest Holder within the meaning of Code Section 707(a), the Interest Holder shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Interest Holder's Account shall be adjusted to reflect the payment of that compensation.

4.4.8.  *Unrealized Receivables.*  If an Interest Holder's Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holder's Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that

15

portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.5 hereof that is taxable as ordinary income for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture income. Any questions as to the aforesaid allocation of ordinary income, to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Manager.

4.4.9. *Withholding.* All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement. In the event the Company is obligated to withhold an amount in excess of amounts currently distributable to an Interest Holder, the Company may reduce future amounts distributable to the Interest Holder, treat such amounts as a debt of the Interest Holder to the Company, or require the Holder to contribute such amounts to the Company in payment of such withholding obligation.

4.4.10. *Curative Allocations.* The allocations set forth in Sections 4.4.1, 4.4.2, and 4.4.6 are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Regulations. Notwithstanding any other provision of this Article IV other than such allocations, such allocations shall be taken into account in allocating Profits, Losses and items of Partnership income, gain, loss and deductions to the Interest Holders so that, to the extent possible, the net amount of such allocations of Profits, Losses and other items and those allocations to each Interest Holder in the current and future periods shall be equal to the net amount of items that would have been allocated to each such Interest Holder if the allocations in Sections 4.4.1, 4.4.2, and 4.4.6 had not occurred.

4.5.    *Liquidation and Dissolution.*

4.5.1. If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders pursuant to the provisions of Section 4.2 above.

4.5.2. No Interest Holder shall be obligated to restore a Negative Capital Account.

4.6.    *General.*

4.6.1. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Manager.

4.6.2. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Manager. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.3

16

and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.5.

4.6.3.   All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders at the time the allocation or distribution is to be made.   Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year, provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary non-recurring items of the Company.

4.6.4.   The Manager is hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect the economic interest of the Interest Holder without the Interest Holder's prior written consent.

## Article V
## Management: Rights, Powers, and Duties

5.1.   *Management.*

5.1.1.   *Managers.*   In accordance with O.C.G.A. Section 14-11-304, the Company shall be managed by one or more managers, referred to herein as the Manager, each of whom may, but need not, be a Member.   The Manager shall be elected by the Members in accordance with their respective Percentages.   All decisions not specifically reserved to the Members under the Act or this Agreement shall be delegated to the Manager.   Upon execution of this Agreement, and without further action, PHG and JAX shall each be elected as the Manager of the Company, to serve until succeeded in accordance with the terms of this Agreement.   For purposes of this Agreement, the Manager may from time to time be referred to herein as the "Managing Member" and any reference to the Managing Member shall be deemed to be a reference to the Manager for all purposes.

5.1.2.   *General Powers.*   The Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for Company purposes, the power to:

5.1.2.1.   acquire by purchase, lease, or otherwise (including, specifically, but without limitation, foreclosure and/or subdivision), any real or personal property, tangible or intangible;

5.1.2.2.   construct, operate, maintain, rezone and improve, and to own, sell, convey, assign, mortgage, or lease any real estate and any personal property;

17

5.1.2.3.   sell, dispose, trade, or exchange Company assets in the ordinary course of the Company's business;

5.1.2.4.   enter into agreements and contracts, execute any instrument, checks, drafts, notes and other negotiable instruments, and to give receipts, releases, and discharges;

5.1.2.5.   purchase liability and other insurance to protect the Company's properties and business;

5.1.2.6.   execute or modify leases with respect to any part or all of the assets of the Company;

5.1.2.7.   prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust that may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

5.1.2.8.   execute any and all other instruments and documents that may be necessary or in the opinion of the Managers desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

5.1.2.9.   make any and all expenditures that the Manager, in its sole discretion, deem necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of their obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization and financing and operation of the Company;

5.1.2.10.   enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company;

5.1.2.11.   invest and reinvest Company reserves in short-term instruments or money market funds; and

5.1.2.12   undertake any expenditure or become bound by any obligation which has been expressly approved in annual operating budget adopted and approved pursuant to the provisions of Section 5.1.3 below.

5.1.3.   *Extraordinary Transactions.*

5.1.3.1.   Notwithstanding anything to the contrary in this Agreement, the Manager shall not undertake any of the following without the unanimous approval of the Members:

5.1.3.1.1.   any Capital Transaction;

18

5.1.3.1.2.  the Company's lending or borrowing more than $25,000 on any one occasion or in the aggregate more than $50,000 in any one calendar year;

5.1.3.1.3.  the admission of additional Members to the Company;

5.1.3.1.4.  the Company's engaging in business in any jurisdiction that does not provide for the registration of limited liability companies;

5.1.3.1.5  mortgage, pledge, hypothecate, create a lien or security interest against, or further encumber (or contract for, commit to or suffer or permit any of the foregoing) assets of the Company;

5.1.3.1.6  transfer, sell, convey or assign all or substantially all of the assets of the Company, or any interest therein or any title thereto (or contract for or suffer or permit any of the foregoing), including, without limitation, options to purchase and so called "installment sales contracts," "land contracts," or "contracts for deed");

5.1.3.1.7.  the Company's electing to exercise any Purchase Option pursuant to Section 6.3;

5.1.3.1.8  do any action in contravention of or in excess of the scope of this Agreement;

5.1.3.1.9  possess property of the Company, or assign rights in specific property of the Company, for other than Company purposes;

5.1.3.1.10   file a voluntary petition or otherwise initiate proceedings (i) to have the Company adjudicated insolvent or, (ii) seeking an order for relief of the Company as debtor under the United States Bankruptcy Code (11 U.S.C. §§ 101 *et seq.*); file any petition seeking any composition, reorganization, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy laws or any other present or future applicable federal, state or other statute or law relative to bankruptcy, insolvency, or other relief for debtors with respect to the Company; or seek the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or of all or any substantial part of the Property, or make any general assignment for the benefit of creditors of the Company, or admit in writing the inability of the Company to pay its debts generally as they become due, or declare or effect a moratorium on the Company's debt or take any action in furtherance of any proscribed action;

5.1.3.1.11  amend this Agreement except as otherwise specifically authorized herein;

5.1.3.1.12  adopt and approve the annual operating budget of the Company;

5.1.3.1.13  enter into any transaction, the value of which exceeds $25,000; or

19

5.1.3.1.14  make any distribution to the Members of Distributable Cash, except for a Tax Distribution;

5.1.3.1.15  make any call for Additional Capital Contributions or accept any Additional Capital Contributions;

5.1.3.1.16  enter into any merger or consolidation of the Company pursuant to Section 14-11-903 of the Act;

5.1.3.1.17  make the decision to adjust, settle, compromise or pay any claim, obligation, debt, demand, suit, litigation or judgment against the Company unless (i) the same is fully covered by insurance or (ii) such action does not involve an amount in excess of $2,000 in any particular instance; or

5.1.3.1.18  modify or waive any terms of the documents relating to the Loan Assets.

5.1.4.  *Limitation on Authority of Members.*

5.1.4.1.  No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

5.1.4.2.  This Section 5.1 supersedes any authority granted to the Members pursuant to Section 14-11-301(a) of the Act.  Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

5.1.5.  *Removal of Manager.*  Except as provided below, upon the vote of all Members, the Members, at any time and from time to time and for any reason, may remove the Manager then acting and elect a new Manager pursuant to Section 5.2 below.  Additionally, upon the motion of Members holding hundred percent (100%) of the Percentages then being held by the Members, at any time and from time to time, the Manager may be removed  for Cause.  In such case, the Members shall elect a new Manager pursuant to Section 5.2 below.  In the event of removal for Cause, the Manager's Membership Rights in the Company shall immediately become a non-voting interest.

5.2.  *Meetings of and Voting by Members.*

5.2.1.  A meeting of the Members may be called at any time by the Manager or by those Members holding at least twenty percent (20%) of the Percentages then held by Members.  Meetings of Members shall be held at the Company's principal place of business or at any other place designated by the Person calling the meeting.  Not less than ten (10) nor more than ninety (90) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting.  The notice shall state the time, place and purpose of the meeting.  Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver

20

of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than one hundred percent (100%) of the Percentages then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by his duly authorized attorney in fact.

5.2.2.  Except as otherwise provided in this Agreement, the affirmative vote of members holding one hundred percent (100%) of the Percentages then held by Members shall be required to approve any matter coming before the Members.

5.2.3.  In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding one hundred percent (100%) of the Percentages then held by Members.

5.3.    *Personal Services; Compensation; Fees*

5.3.1.  No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Manager, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

5.3.2.  Unless approved by Members holding one hundred percent (100%) of the Percentages then held by Members, the Manager shall not be entitled to compensation for services performed for the Company. However, upon substantiation of the amount and purpose thereof, the Manager shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

5.4.    *Duties of Parties.*

5.4.1.  The Manager shall devote such time to the business and affairs of the Company as is necessary to carry out the Manager's duties set forth in this Agreement.

5.4.2.  Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and the Member shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

5.4.3.  Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

21

5.5.    *Liability and Indemnification.*

    5.5.1.    The Manager shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Manager within the scope of the authority conferred on the Manager by this Agreement, except for acts of intentional misconduct or knowing violation of the law or for any transaction for which the violator received a personal benefit in breach of the operating agreement.

    5.5.2.    The Company shall indemnify the Manager for any act performed by the Manager within the scope of the authority conferred on the Manager by this Agreement, except for acts of intentional misconduct or knowing violation of the law or for any transaction for which the violator received a personal benefit in breach of the operating agreement.

5.6.    *Power of Attorney.*

    5.6.1.    *Grant of Power.*    Each Member constitutes and appoints the Manager as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place and stead, to make, execute, sign, acknowledge, and file:

        5.6.1.1.    one or more articles of organization;

        5.6.1.2.    all documents (including amendments to articles of organization) that the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this Agreement approved by the Members;

        5.6.1.3.    any and all other certificates or other instruments required to be filed by the Company under the laws of the State of Georgia or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of Georgia;

        5.6.1.4.    one or more fictitious or trade name certificates; and

        5.6.1.5.    all documents that may be required to dissolve and terminate the Company and to cancel its articles of organization.

    5.6.2.    *Irrevocability.*    The foregoing power of attorney is irrevocable and is coupled with an interest; and, to the extent permitted by applicable law, shall survive the death or disability of a Member.    It also shall survive the Transfer of an Interest, except that if the transferee is approved for admission as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge and file any documents needed to effectuate the substitution.    Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses that may be available to contest, negate or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

**Article VI**

22

## Transfer of Interests and Withdrawals of Members

6.1.  *Transfers.*  No Member may Transfer all, or any portion of, or any interest or rights in, the Membership Rights owned by the Member, and no Interest Holder may Transfer all, or any portion of, or any interest or rights in, any Interest.  Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members.  The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Rights are attempted to be transferred in violation of this Section 6.1 shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive distributions from the Company, or have any other rights in or with respect to the Membership Rights. Notwithstanding anything set forth in this Agreement to the contrary, but provided that the Transfer meets the Conditions of Transfer, any Member may at any time, and from time to time, Transfer all, or any portion of, or any interest or rights in, the Member's Interest or Membership Rights to (i) any other Member; (ii) any member of the Member's Family; or (iii) any Affiliate of the Member, and such transferee shall be admitted as a Member and shall be entitled to exercise the rights of a Member.

6.2.  *Voluntary Withdrawal.*  Except as set forth in Article VIII, no Member shall have the right or power to Voluntarily Withdraw from the Company.

6.3.  *Optional Buy-out in Event of Involuntary Withdrawal.*

6.3.1.  Upon an Involuntary Withdrawal hereunder, the withdrawn Member shall be deemed to offer for sale (the "Withdrawal Offer") to the Members other than the withdrawn Member ("Remaining Members") and the Company all of the Membership Rights owned of record and beneficially by the withdrawn Member (the "Withdrawal Interest").

6.3.2.  The Withdrawal Offer shall be and remain irrevocable for a period (the "Withdrawal Offer Period") ending at 11:59 P.M., local time at the Company's principal office on the sixtieth (60th) day following the date of Involuntary Withdrawal.  At any time during the Withdrawal Offer Period, the Remaining Members may accept the Withdrawal Offer by notifying the withdrawn Member (the "Withdrawal Notice") of their acceptance.  The withdrawn Member shall not be deemed a Member or Manager for the purpose of the vote on whether the Remaining Members shall accept the Withdrawal Offer.

6.3.3.  If the Remaining Members accept the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "Withdrawal Closing Date") for the purchase which shall be not earlier than ten (10) or later than ninety (90) Days after the expiration of the Withdrawal Period.  In the absence of an agreement among the Remaining Members, each Remaining Member shall purchase the Withdrawal Interest in the proportion that his respective Percentage bears to the total Percentages of all of the Remaining Members.  If the Remaining Members fail to accept the Withdrawal Offer, the Company shall have ten (10) days to accept such offer and proceed to close the sale pursuant to the terms of Section 6.3.3 and 6.3.4.

6.3.4.  If the Remaining Members or the Company, as the case may be, accept the Withdrawal Offer, the Remaining Members or the Company, as the case may be, shall purchase the Withdrawal Interest for a price equal to (the "Withdrawal Purchase Price") the lesser of (i) the Appraised Value of the Withdrawal Interest or (ii) the amount of such Withdrawing Member's unreturned Capital Contribution, as of the date of the Withdrawal Offer, provided in all events that sufficient funds are available for distribution to the Members pursuant to Section 4.4.  The Withdrawal Purchase Price shall be paid in cash on the Withdrawal Closing Date, unless the Remaining Members or the Company, as the case may be, elect prior to or on the Withdrawal Closing Date to pay the Withdrawal Purchase Price in installments as provided in Section 6.5 of this Agreement.

6.3.5.  If the Remaining Members and the Company fail to accept the Withdrawal Offer, then the withdrawn Member or the withdrawn Member's successor, as the case may be, upon the expiration of the Withdrawal Offer Period, thereafter shall be treated as the unadmitted assignee of a Member.

6.3.6.  Each Member hereby appoints the Manager as its agent and attorney-in-fact for the purpose of executing and delivering any and all documents necessary or appropriate to convey the Withdrawal Interest as required under this Section 6.3 if such Member fails to do so pursuant hereto, which conveyance shall divest the Member whose Withdrawal Interest is so conveyed of all right, title or equity in or to such Withdrawal Interest.  The powers of attorney granted herein, being coupled with an interest, are irrevocable and shall not be revoked by the death, disability, dissolution or liquidation of any Member or for any other reason.  Each Member hereby releases the Manager from any and all claims and liabilities for or resulting from the conveyance of the Withdrawal Interest or the taking of any other action pursuant hereto and in accordance herewith.

6.4.    *Appraised Value.*

6.4.1.  The term "Appraised Value" shall mean the "fair market value," as defined under Treasury Regulations Section 20.2031-1(b) of the Company's assets as hereinafter provided and taking into account the liabilities of the Company.  Notwithstanding the foregoing, the appraiser shall consider, if applicable, the fact that the Withdrawal Interest consists of a minority, non-controlling interest in connection with determining the Appraised Value.  Within fifteen (15) days after demand by either one or the other, the Company and the Withdrawing Member shall jointly appoint an appraiser who shall render a report stating that value.  In the case where the Company and Withdrawing Member are unable to agree upon an appraiser, then each shall appoint an appraiser to determine the fair market value of the Company's Assets.  If the two appraisers agree upon the fair market value of the Company's Assets, they shall jointly render a single written report stating that value.  If the two appraisers cannot agree upon the fair market value of the Company's Assets, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company's assets and determine the fair market value, and shall render a written report of his opinion thereon.  The Company shall pay the fees and costs of the single appraiser if one is agreed upon.  If not, then each party shall pay the fees and costs of the appraiser appointed by that party, and the fees and other costs of the third appraiser shall be shared equally by the Company and the Withdrawing Member.

24

6.4.2.   The fair market value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the fair market contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the fair market contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

6.5.   *Installment Method.* If the Company or the Remaining Members, as the case may be (the "Purchaser"), elect to pay the Purchase Price (the "Indebtedness") on an installment basis, the Purchaser shall evidence the obligation to pay the Indebtedness by executing and delivering its or their promissory note to the withdrawn Member or the Transferor (the "Payee") (such note calling for equal monthly payments with a maturity date no longer than five years and with interest accruing at a fixed rate per annum equal to the Prime Rate in effect on the date of the Note plus two hundred (200) basis points (one hundred [100] basis points being equal to one percentage point).

6.6.   *Restraining Order; Specific Performance.*

6.6.1.   *Restraining Order.* If a Member shall at any time Transfer or attempt to Transfer its Interest or part thereof in violation of the provisions of this Agreement and any rights hereby granted, then the other Members shall, in addition to all rights and remedies at law and in equity, be entitled to a decree or order restraining and enjoining such Transfer and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law; it being hereby expressly acknowledged and agreed that damages at law will be an inadequate remedy for a breach or threatened breach of the violation of the provisions concerning Transfer set forth in this Agreement.

6.6.2.   *Specific Performance.* The parties declare that it is impossible to measure in money the damages which will accrue to a Person having rights under this Article VI by reason of the failure of another to perform any obligations arising pursuant to this Article VI. Accordingly, if any Person shall institute any action or proceeding to seek specific performance of the provisions of Article VI, any Person against whom such actions or proceedings may be brought hereby waives the claim or defense that such Person has an adequate remedy at law, and no Person shall in any action or proceeding put forward the claim or defense that such remedy at law exists.

### Article VII
### Member Disputes

7.1    The Members agree that in the event of a dispute they shall first attempt to resolve such dispute through the diligent exercise of good faith negotiation among themselves.

7.2    In the event the Members are unable to negotiate a solution to any disputes, they shall seek to have the dispute resolved through an alternative dispute resolution mechanism involving mediation using the services of a commercial provider of alternative dispute resolution services.

25

7.3     In the event a dispute among the Members is not resolved as provided any Member shall have the right to withdraw from ownership in the Company at any time by giving the other Members and the Company 60 days prior written notice (the "Dispute Notice") thereof (the Member giving such a notice hereinafter referred to as the "Withdrawing Party", and the Member or Members to whom such a Dispute Notice is delivered hereinafter referred to as the "Non-Withdrawing Party"). The Dispute Notice shall set forth an affirmative election to proceed with the Buy-Sell Procedure of Article VIII.

7.4     In the event of the withdrawal of a Member pursuant to this Article, the Member or party or parties owning Membership Rights in the Company as a result of a transfer from a Member shall be bound by the actions and elections of such transferring Member, and such transferring Member shall be the agent of the transferee for all matters occurring pursuant to this Agreement.

7.5     Notwithstanding the above, should any Member seek to proceed with the Buy-Sell Procedure of Article VIII, such Member shall have the right to do so irrespective of the occurrence of a dispute or any corresponding mediation but may proceed directly to delivery of a "Buy-Sell Offer" (as defined below) without a corresponding Dispute Notice.

## Article VIII
## Buy-Sell Procedures

8.1     If the Withdrawing Party elects to proceed under this Article VIII, such party shall deliver to the Non-Withdrawing Party with the Dispute Notice an offer ("Buy-Sell Offer") in writing to purchase all of the Membership Rights in the Company of the Non-Withdrawing Party. The Buy-Sell Offer shall contain a statement of value for the entire Company ("Value") established by the Withdrawing Party in his discretion. The Non-Withdrawing Party then shall be obligated either:

8.1.1   To purchase the Membership Rights of the Withdrawing Party for the amount which the Withdrawing Party would receive if the Company sold all of its property for an amount equal to the Value and the proceeds were distributed pursuant to Article IV hereof; or

8.1.2   To sell to the Withdrawing Party the Membership Rights of the Non-Withdrawing Party for the amount which the Non-Withdrawing Party would receive if the Company sold all of its property for an amount equal to the Value and the proceeds were distributed pursuant to Article IV hereof.

8.2     The Non-Withdrawing Party shall give written notice of such election to the Withdrawing Party within 30 days after receipt of the Offer. Failure of the Non-Withdrawing Party to give the Withdrawing Party notice that the Non-Withdrawing Party has elected under subparagraph 8.1.1 or 8.1.2 above shall be conclusively deemed to be an election under 8.1.2 above, and failure on the part of the Withdrawing Party to deliver with the Dispute Notice an Offer shall be conclusively deemed to be an Offer stating a purchase price equal to the book value of the Membership Rights owned by the Withdrawing Party, such book value to be determined by reference to the Company's financial statements as of the end of the fiscal quarter ended immediately prior to the time for delivery of Offer required.

26

8.3     The closing of a purchase pursuant hereto shall be held at a place in Atlanta, Georgia on a date not less than 20 days nor more than 30 days after the Non-Withdrawing Party has notified the Withdrawing Party in writing of his election, such date and place to be established by the Non-Withdrawing Party. At closing, the selling party shall assign to the purchasing party the Membership Rights so sold and the purchasing party shall pay the purchase price therefor. If the Withdrawing Party is the purchasing party hereunder the purchase price shall be paid in cash or by wire transfer of immediately available funds. If the Non-Withdrawing Party is the purchasing party, the purchase price shall be paid 25% in cash or by wire transfer of immediately available funds with the remainder to be paid by the delivery of a promissory note which note shall be payable in three equal annual installments of principal plus interest on the total unpaid balance at the rate equal to 8% per annum, such interest rate accruing and compounding monthly while such debt exists. The amount of such debt due from the purchasing Member to the selling Member shall be a charge or lien upon the Membership Rights being purchased by the purchasing Member. The purchasing Member shall take whatever action may be reasonably requested by the selling Member and shall execute and deliver such documents as may be reasonably necessary to perfect such lien or charge including but not limited to the delivery of any certificates evidencing the Membership Rights.

8.4     Notwithstanding anything to the contrary contained herein, any Member purchasing Membership Rights under this Section 8 shall obtain the release of the selling Member from personal liability from any and all liabilities of the Company (including, without limitation, loans from banks and other institutional lenders) as a condition precedent to the purchase of the Membership Rights of the selling Member.

8.5     Each Member hereby appoints the Manager as its agent and attorney-in-fact for the purpose of executing and delivering any and all documents necessary or appropriate to convey the Membership Rights of the Withdrawing Party as required under this Section 8.5 if such Member fails to do so pursuant hereto, which conveyance shall divest the Member whose Membership Rights are so conveyed of all right, title or equity in or to such Membership Rights. The powers of attorney granted herein, being coupled with an interest, are irrevocable and shall not be revoked by the death, disability, dissolution or liquidation of any Member or for any other reason. Each Member hereby releases the Manager from any and all claims and liabilities for or resulting from the conveyance of the Membership Rights or the taking of any other action pursuant hereto and in accordance herewith.

8.6     The parties declare that it is impossible to measure in money the damages which will accrue to a Person having rights under this Article VIII by reason of the failure of another to perform any obligations arising pursuant to this Article VIII. Accordingly, if any Person shall institute any action or proceeding to seek specific performance of the provisions of Article VIII, any Person against whom such actions or proceedings may be brought hereby waives the claim or defense that such Person has an adequate remedy at law, and no Person shall in any action or proceeding put forward the claim or defense that such remedy at law exists.

### Article IX
### Dissolution, Liquidation, and
### Termination of the Company

27

9.1.   *Events of Dissolution*. The Company shall be dissolved and its affairs wound up only upon the earlier of the following to occur:

9.1.1. The written agreement of all of the Members to dissolve the Company; or

9.1.2. A decree of judicial dissolution.

Notwithstanding the provisions of Section 14-11-602(b)(4) of the Georgia Act, the Company shall not dissolve upon an event of dissociation with respect to the last remaining Member, but instead the legal successor to such Member shall automatically become a Member of the Company with all the rights appurtenant thereto.

9.2.   *Procedure for Winding Up and Dissolution*. If the Company is dissolved, the Manager shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 4.4.

9.3.   *Filing of Statement of Commencement of Winding Up*. If the Company is dissolved, the Members shall promptly file a Statement of Commencement of Winding Up (under O.C.G.A. §14-11-606) with the Secretary of State of Georgia. If there are no remaining Members, the Statement shall be filed by the last Person to be a Member; if there are no remaining Members, or a Person who last was a Member, the Statement shall be filed by the legal or personal representatives of the Person who last was a Member.

## Article X
## Books, Records, Accounting, and Tax Elections

10.1.   *Books and Records*.

10.1.1. Subject to the terms hereof, at all times during the existence of the Company, PHG shall keep or cause to be kept complete and accurate books and records appropriate and adequate for the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the articles of organization and operating agreement and all amendments to the articles and operating agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, and local tax returns.

10.1.2. The books and records shall be maintained at the Company's principal place of business. Any Member or such Member's duly authorized representative, subject to reasonable standards established by the Members governing what information and documents are to be furnished at what time and location and at whose expense, shall have the right at any time, for any purpose reasonably related to such Member's Membership Interest, to inspect and copy from such books and documents during normal business hours.

10.1.3. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

10.1.4 Except as stated in this Section 10.1, the provisions of O.C.G.A. §14-11-313 shall not apply.

10.2. *Bank Accounts.* The Members shall maintain or cause to be maintained one or more accounts for the Company in such depositories as the Manager shall select. All receipts of the Company from whatever source received shall be deposited to such accounts, all expenses of the Company shall be paid from such accounts, and no funds not belonging to the Company shall be deposited to such accounts. All amounts so deposited shall be received, held and disbursed by a Person or Persons designated by the Members only for the purposes authorized by this Agreement. All signatories on any such accounts shall be bonded under a blanket commercial bond insuring the Company against loss, and such accounts shall be insured against loss from forgery.

10.3. *Accounting Decisions.* All decisions as to accounting matters, except as this Agreement specifically provides to the contrary, shall be made by the Manager, including the election to amortize organizational expenses over 60 months under Code Section 709 and the method of accounting (cash or accrual). In addition, the Company shall maintain accounting records in accordance with generally accepted accounting principles.

10.4. *Fiscal and Taxable Years.* The Company's fiscal year shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the requirements and limitations of the Code.

10.5. *Reports.* Except as provided below, within ninety (90) days after the end of each taxable year of the Company, PHG shall cause to be delivered to all Members a profit and loss statement for, and a balance sheet as of the end of, such year together with a statement by an accountant that such profit and loss statement, balance sheet and any related notes are complete and correct and represent the financial condition of the Company as of the date indicated and the results of the operations of the Company for the period indicated in accordance with generally the method of accounting adopted in accordance with Section 10.3. Except as provided below, within sixty (60) days after the end of each calendar quarter, PHG shall prepare and distribute to the Members a statement showing the amounts distributed to each Member during such calendar quarter and for each previous calendar quarter during the fiscal year.

10.6. *Tax Returns.* JAX shall cause an accountant to prepare all federal, state and municipal tax returns that the Company is required to file, and shall file with the appropriate taxing authorities, all returns required to be filed by the Company in a manner required for the Company to be in compliance with any law governing the timely filing of such returns.

10.7. *Tax Matters Partner.* JAX is hereby designated to act on behalf of the Company as the "Tax Matters Partner" within the meaning of that term in Code Section 6231(a)(7) in administrative and judicial proceedings relating to the determination of LLC items of income, deduction and credit for federal income tax purposes. The Tax Matters Partner shall have all

29

powers and responsibilities provided in Code Section 6231, et seq. The Tax Matters Partner may enter into and execute on behalf of all Members an agreement with the Internal Revenue Service extending the statute of limitations for making an assessment of federal income taxes or the time periods relating to submitting administrative adjustment requests for the Company. The Tax Matters Partner may not enter into any agreement with the Internal Revenue Service which affects the amount, deductibility or credit of any partnership item without the prior written consent of the Members. The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities that may come to the attention of the Tax Matters Partner and, in the event of an audit of the Company's federal income tax return, the Tax Matters Partner will provide all Members with the information required by law relating to the administrative or judicial proceedings for the adjustment of partnership items. The Company shall pay and be responsible for all reasonable third party costs and expenses incurred by the Tax Matters Partner in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company.

10.8.   *Tax Elections.* JAX shall have the authority to make all Company elections for federal income tax purposes permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at JAX's sole and absolute discretion.

10.9.   *Title to Company Property.*

10.9.1. Except as provided in Section 10.9.2, all real and personal property acquired by the Company shall be acquired and held by the Company in its name.

10.9.2. The Manager may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name. Without limiting the foregoing, the Manager may cause title to be acquired and held in its name or in the names of trustees or nominees for the Company. It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company, and all of that property shall be treated as Company property.

## Article XI
## General Provisions

11.1.   *Assurances.* Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

11.2.   *Notifications.* Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company shall be given by the Manager. A notice must be addressed to an Interest Holder at the Interest Holder's

30

last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is addressed. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

11.3. *Specific Performance.* The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

11.4. *Complete Agreement.* This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

11.5. *Applicable Law.* All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the law of the State of Georgia.

11.6. *Section Titles.* The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

11.7. *Binding Provisions.* This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

11.8. *Jurisdiction and Venue.* Any suit involving any dispute or matter arising under this Agreement may only be brought in the Superior Court of Gwinnett County, Georgia. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

11.9. *Terms.* Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

11.10. *Severability of Provisions.* Each provision of this Agreement shall be considered severable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

31

11.11. *Counterparts.* This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

11.12. *Estoppel Certificate.* Each Member shall, within ten (10) days after written request by any Member or the Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that  (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof.  If the certificate is not received within that ten (10) day period, the Manager shall execute and deliver the certificate on behalf of the requested Member, without qualification, pursuant to the power of attorney granted in Section 5.6.

**********

[SIGNATURES COMMENCE ON NEXT PAGE]

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

THE COMPANY:

PHG JACKSONVILLE, LLC, a Georgia
limited liability company

By:  Peachtree Hotel Group II, LLC, a Georgia
     limited liability company, its Manager

By: _____ (SEAL)
     Jatin R. Desai, Manager

By: JAX Fairfield Hotel Group, LLC, a Florida
     limited liability company, its Manager

By: _____
     Chittranjan K. Thakkar, Manager

*Signature Page to Operating Agreement of
PHG Jacksonville, LLC*

THE MEMBERS:

PEACHTREE HOTEL GROUP II, LLC, a
Georgia limited liability company

By: _____ (SEAL)
    Jatin R. Desai, Manager

JAX FAIRFIELD HOTEL GROUP, LLC, a
Florida limited liability company

By: _____
    Chittranjan K. Thakkar, Manager

*Signature Page to Operating Agreement of
PHG Jacksonville, LLC*

## EXHIBIT A
### List of Members, Capital and Percentages

| Name Address, and Taxpayer I.D. Number | Initial Cash Capital Contribution | Percentages |
|---|---|---|
| Peachtree Hotel Group II, LLC 5607 Glenridge Drive Suite 430 Atlanta, Georgia 30342 Attention: Greg M. Friedman Tax ID#: 27-0944814 | $100.00 | 33 1/3% |
| JAX Fairfield Hotel Group, LLC 5875 Peachtree Industrial Boulevard Suite 340 Norcross, Georgia 30092 Attention: Chittranjan K. Thakkar Tax ID#: 27-3554475 | $200.00 | 66 2/3% |

*Additionally, the Members have contributed the following amounts as the "Initial Member Loans":

| Name | Initial Member Loan Amount |
|---|---|
| Peachtree Hotel Group II, LLC | $117,785.67 |
| JAX Fairfield Hotel Group, LLC | $58,742.83 |

*Exhibit A to Operating Agreement of PHG Jacksonville, LLC*

## FIRST AMENDMENT TO OPERATING AGREEMENT OF

## PHG JACKSONVILLE, LLC

**THIS FIRST AMENDMENT TO OPERATING AGREEMENT OF PHG JACKSONVILLE, LLC** (this "Amendment") is made and entered into on this ____ day of May, 2012, by and between **PEACHTREE HOTEL GROUP II, LLC**, a Georgia limited liability company ("PHG"), and **JAX FAIRFIELD HOTEL GROUP, LLC**, a Florida limited liability company ("JAX"). PHG and JAX are collectively the "Members." **JAX FAIRFIELD FINANCIAL, LLC**, a Florida limited liability company ("Lender"), is also made a party to this Amendment solely for the purpose of acknowledging and agreeing to the provisions contained in Section 5(b) hereof.

### BACKGROUND STATEMENT

On September 17, 2010, PHG Jacksonville, LLC (the "Company") was formed by the filing of its Articles of Organization with the Georgia Secretary of State.

Effective September 30, 2010, the Members entered into that certain Operating Agreement of PHG Jacksonville, LLC (the "Operating Agreement").

As of the date hereof, PHG and JAX are the sole members and sole managers of the Company.

On April 21, 2011, the Company, as Seller, and Embarc, LLC, a Florida limited liability company ("New Owner"), as Purchaser, entered into that certain Agreement for Sale and Purchase of Fairfield Inn and Suites Jacksonville Airport, as amended (the "Purchase Agreement"), pursuant to which the Company agreed to sell to New Owner that certain real property located in Duval County, Florida, as more particularly described on Exhibit A of the Purchase Agreement (the "Property").

The Property is secured by that certain loan from Lender to the Company in the original principal amount of $2,180,884.78 (the "Loan"), as evidenced by that certain Promissory Note dated September 30, 2010.

On the date hereof, (i) the Company is selling the Property to New Owner substantially in accordance with the terms and conditions of the Purchase Agreement, (ii) New Owner is assuming all of the Company's obligations under the Loan in connection with the sale of the Property, (iii) the Loan is being modified to provide in part for a new principal amount of $4,072,000, as evidenced in part by that certain Construction Loan Agreement, dated as of even date herewith, by Lender and New Owner, (iv) the Company is entering into that certain Participation Agreement with Lender (the "Participation Agreement"), pursuant to which the Company will acquire from Lender an undivided interest in and participation in the Loan, and (v) the Company is entering into that certain letter agreement with Lender (the "Letter Agreement"), pursuant to which Lender is granting an option to the Company to allow the Company to take title to the Property under certain circumstances (the "Option").



1

6691427

Pursuant to the terms of the Participation Agreement, the Company will have the right to consent to certain matters relating to the Loan.

The Members now desire to (i) approve (a) the sale by the Company of the Property to New Owner substantially in accordance with the terms and conditions of the Purchase Agreement, (b) the assumption by New Owner of all of the Company's obligations under the Loan in connection with the sale of the Property, (c) the modification of the Loan to provide in part for a new principal amount of $4,072,000, and (d) the Company's entering into of the Participation Agreement and performance of its obligations thereunder, (ii) amend the Operating Agreement to provide that PHG, in its capacity as a manager of the Company, will have the unilateral right to exercise, on behalf of the Company, the Company's consent rights relating to the Loan as set forth in the Participation Agreement without the consent or approval of JAX, and (iii) amend the Operating Agreement to provide for (a) certain changes if the Company takes title to the Property through its exercise of the Option pursuant to the Letter Agreement, and (b) certain other agreements as set forth below.

**NOW, THEREFORE,** in consideration of the promises and covenants contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged conclusively, the Operating Agreement hereby is amended as follows:

1.    Defined Terms.  Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Operating Agreement.

2.    Approval of Sale; Loan Assumption; Loan Modification; and Participation Agreement.  By execution of this Amendment, JAX and PHG, in their capacities as the sole members and sole managers of the Company, hereby approve (i) the sale by the Company of the Property to New Owner substantially in accordance with the terms and conditions of the Purchase Agreement, (ii) the assumption by New Owner of all of the Company's obligations under the Loan in connection with the sale of the Property, (iii) the modification of the Loan to provide in part for a new principal amount of $4,072,000, and (iv) the Company entering into the Participation Agreement and performing its obligations thereunder, and further approve of and consent to the Company taking any and all actions necessary, convenient or appropriate to (i) sell the Property to New Owner substantially in accordance with the terms and conditions of the Purchase Agreement, (ii) cause New Owner to assume all of the Company's obligations under the Loan in connection with the sale of the Property, (iii) cause New Owner to modify the Loan to provide in part for a new principal amount of $4,072,000, and (iv) enter into the Participation Agreement and perform its obligations thereunder, including without limitation the execution of any and all documents, agreements, and instruments in connection therewith.  In furtherance of the foregoing, PHG and JAX, acting in their capacities as managers of the Company, and Chittranjan K. Thakkar ("Thakkar"), acting in his capacity as an authorized agent of the Company, acting together or any of PHG, JAX or Thakkar acting alone, are hereby authorized, empowered and directed to take any and all actions, execute any and all documents, agreements and instruments, make any and all filings and expenditures and take any and all steps deemed necessary, convenient or appropriate to cause the Company to consummate any of the actions contemplated by the foregoing in the name of and on behalf of the Company.  Any documents, agreements, instruments and actions pertaining to the foregoing heretofore executed, delivered and performed for and on behalf of the Company are hereby ratified, approved, and confirmed.

2

6691427

3.      Amendment - Unilateral Rights of PHG.  By execution of this Amendment, JAX and PHG, in their capacities as the sole members and sole managers of the Company, hereby agree, and the Operating Agreement is hereby amended as necessary to provide, that PHG, in its capacity as a manager of the Company, shall have the unilateral right to exercise, on behalf of the Company, all of the Company's consent rights relating to the Loan under the Participation Agreement (the "Company Consent Rights" which shall include, without limitation, the Company's right to consent to those matters specified in Section 12(b) of the Participation Agreement), without the consent or approval of JAX.  In furtherance of the foregoing, JAX acknowledges and agrees that (i) it shall have no right, power or authority to act on behalf of the Company with respect to any Company Consent Right, and any action taken by JAX in violation of the foregoing shall constitute a material breach of the Operating Agreement, and (ii) it shall not take any action, or intentionally refrain from taking any action, that would interfere with, hinder, or delay the exercise by PHG of its rights specified in this Section 3.

4.      Amendment – Additional Capital.  By execution of this Amendment, JAX and PHG, in their capacities as the sole members and sole managers of the Company, hereby agree and the Operating Agreement is hereby amended as necessary to provide, that (i) if the Option is exercised, then JAX and PHG shall promptly make additional Capital Contributions to the Company in proportion to their respective Percentages in the aggregate amount necessary to allow the Company to pay its pro rata share of all expenses incurred in connection with the Company taking title to the Property pursuant to the Option (such expenses to be shared by the Company and Lender in accordance with their respective percentage interests in the Loan as specified in the Letter Agreement), and (ii) JAX, in its capacity as a manager of the Company, shall have the unilateral right to make capital calls under certain conditions in accordance with the following:

(a)      Permitted Capital Calls.  At any time after the date of this Amendment, if JAX determines in its reasonable discretion that additional contributions to the capital of the Company are needed to pay Necessary Expenses (defined below), then JAX shall advise the Members of the Company's capital needs and deliver a written notice to each Member (each a "Permitted Capital Call") setting forth each Member's pro rata share (based on the Members' respective Percentages) of the Company's required additional capital, the Necessary Expenses to be paid with such additional capital, and the date by which the additional Capital Contribution is due, such date not being earlier than thirty (30) days following effective notice of the need for such additional capital.  Each Member (including, without limitation, JAX) shall contribute to the Company its share of such required additional capital by the due date as determined in accordance with the immediately preceding sentence.  Except as described in this Section 4(a), no Member or Manager shall be permitted to make a capital call (and no Member shall be obligated to make an additional Capital Contribution to the Company) without the prior written consent of all of the Members.

(b)      Necessary Expenses.  The term "Necessary Expenses" means (i) after the Reacquisition Date (defined below), the following:  (A) all real estate taxes and other taxes affecting the Property, (B) all insurance premiums for the Property, (C) all costs and expenses reasonably necessary to comply with all legal requirements and insurance requirements now or

6691427

hereafter applicable to the Property and the operation and management thereof, (D) all debt service on indebtedness owed by the Company and secured by the Property, and (E) all costs and expenses reasonably necessary to protect material amounts of the Property in the event of a genuine emergency, and (ii) prior to the Reacquisition Date, the following:  (A) all amounts required to be paid by the Company under the Participation Agreement.

(c)  Failure to Contribute Capital.  If any Member (a "Non-Contributing Member") fails to pay an additional Capital Contribution required pursuant to Section 4 on or before the date required, then the other Member (the "Contributing Member") may either (i) loan the amount of the Non-Contributing Member's additional Capital Contribution (or portion thereof) to the Company as a Member Loan (as defined in Section 3.2.1 of the Operating Agreement), or (ii) request that its additional Capital Contribution be returned; it being agreed that upon receipt of any such request, JAX shall cause the Company to return such funds to the Contributing Member within three (3) days.  Failure of a Member to contribute capital in accordance with this Section 4 shall not constitute a breach of the Operating Agreement, and neither the Company nor any Member may bring a legal action (in law or equity) against a Non-Contributing Member for failure to contribute additional capital.  A Contributing Member's (and the Company's) sole and exclusive remedy for a Non-Contributing Member's failure to contribute additional capital shall be to permit the Contributing Member to make a Member Loan or receive its contribution back as described above.

5.  Amendment – Changes After Exercise of the Option.  By execution of this Amendment, JAX and PHG, in their capacities as the sole members and sole managers of the Company, hereby agree that (i) either JAX or PHG may unilaterally exercise the Option on behalf of the Company without the consent of the other party, and (ii) after the date on which the Company takes title to the Property through its valid exercise of the Option pursuant to the Letter Agreement (such date defined as the "Reacquisition Date"), the following shall apply (and the Operating Agreement is hereby amended as necessary to provide for the following which shall only apply after the Reacquisition Date):

(a)  JAX – Sole Manager/Control.  On the Reacquisition Date, PHG shall automatically withdraw as a Manager without the need for any action, and thereafter, JAX shall be the sole Manager of the Company.  As the sole Manager after the Reacquisition Date, JAX shall have full, exclusive and complete discretion, power, and authority to manage and control the business and affairs of the Company without the consent of PHG; provided, however, that JAX may not undertake, or cause the Company to undertake, any of the following without the prior written consent of PHG:  (i) amend the Operating Agreement; (ii) admit additional Members to the Company or permit the Transfer of any interest in the Company; (iii) engage in any business outside the purpose of the Company, take any action in contravention of the Operating Agreement or possess property of the Company, or assign rights in specific Company property, for other than Company purposes; (iv) merge, consolidate, dissolve, or liquidate the Company; (v) file a voluntary petition or otherwise initiate proceedings to have the Company adjudicated insolvent or seek an order for relief of the Company as a debtor under the United States Bankruptcy Code or otherwise take any bankruptcy action with respect to the Company; (vi) cause the Company to enter into any contract or agreement (whether verbal or written) with, or pay any compensation or fee to, any Person, except in the ordinary course of its business and

6691427

on commercially reasonable and arm's-length terms and conditions; (vii) make a call for additional capital except as permitted pursuant to Section 4 hereof; or (viii) sell, exchange, transfer or otherwise dispose of (collectively, a "Sale") all or any portion of the Property, unless the Net Proceeds (defined below) to the Company from any such Sale of the Property are at least Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00). The term "Net Proceeds" means the gross proceeds from the Sale of the Property, less all actual and reasonable costs and expenses related to such Sale, less all Company liabilities other than the Foreclosure Financing (as defined in the Letter Agreement). After any Sale of all or any portion of the Property, JAX shall cause the Company to distribute to the Members in accordance with the Operating Agreement the Net Proceeds from such Sale (but only after paying or setting aside funds to pay the Foreclosure Financing) within five (5) days after the Company's receipt of such Net Proceeds.

(b)     Indemnification.  By execution of this Amendment, JAX and Lender, jointly and severally, agree to indemnify, defend and hold harmless the PHG Parties (defined below) from and against any and all liabilities, claims, demands, complaints, actions, causes of action, judgments, costs, taxes, and expenses (including without limitation, reasonable attorneys' and accounting fees and investigation costs) and all losses and damages that may be sustained or incurred by the PHG Parties after the Reacquisition Date arising out of or relating to any action taken by, or any failure to act by, any JAX Party (defined below) with respect to the Company, the Property or any indebtedness of the Company (including, without limitation, (i) any action or failure to act by JAX with respect to the Loan or the Foreclosure Financing, (ii) any action or failure to act by JAX with respect to the Company in breach of its fiduciary duties owed to PHG, or (iii) JAX causing the Company to enter into any contract or agreement (whether verbal or written) with, or pay any compensation or fee to, any Person on terms and conditions that are not arm's length or commercially reasonable).  The term "PHG Parties" means PHG, all direct and indirect members of PHG (including, without limitation, Gregory Friedman, Jatin Desai, and Mitul Patel), and all managers, employees, agents, officers, directors, advisors and affiliates of PHG (including, without limitation, Peachtree Hospitality Management, LLC).  The term "JAX Parties" means JAX, all direct and indirect members of JAX (including, without limitation, Thakkar), and all managers, employees, agents, officers, directors, advisors and affiliates of JAX.  PHG in its sole discretion may apply any amounts owed to the PHG Parties under this Section 5(b) as an offset against any amounts owed by a PHG Party to any JAX Party (including, without limitation, Lender) pursuant to any guaranty of any Company indebtedness (including, without limitation, the Foreclosure Financing).

Prior to the Reacquisition Date, the foregoing amendments to the Operating Agreement shall not be effective.

6.     Mutual Release.

(a)     PHG, on behalf of itself and the other PHG Parties, does hereby release, remise, discharge and forever acquit the JAX Parties from any and all actions, causes of action, suits, debts, claims and demands whatsoever in law or equity, whether known or unknown, suspected or unsuspected, foreseen or unforeseen, apparent or not yet discovered, which they ever had, now have or hereinafter can, shall or may have arising out of, resulting from or related to any action or inaction of any JAX Party with respect to the Company, the Property or any

6691427

indebtedness of the Company that occurred prior to the date of this Amendment; provided, however, that nothing herein is intended to or shall be construed to release any rights or claims that any PHG Party may have against any JAX Party arising from this Amendment or any action or inaction of any JAX Party with respect to the Company, the Property or any indebtedness of the Company that occurs after the date of this Amendment.

        (b)    JAX, on behalf of itself and the other JAX Parties, does hereby release, remise, discharge and forever acquit the PHG Parties from any and all actions, causes of action, suits, debts, claims and demands whatsoever in law or equity, whether known or unknown, suspected or unsuspected, foreseen or unforeseen, apparent or not yet discovered, which they ever had, now have or hereinafter can, shall or may have arising out of, resulting from or related to any action or inaction of any PHG Party with respect to the Company, the Property or any indebtedness of the Company that occurred prior to the date of this Amendment; provided, however, that nothing herein is intended to or shall be construed to release any rights or claims that any JAX Party may have against any PHG Party arising from this Amendment or any action or inaction of any PHG Party with respect to the Company, the Property or any indebtedness of the Company that occurs after the date of this Amendment.

      7.    <u>Miscellaneous</u>.  This Amendment constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any prior understanding or agreements respecting the subject matter. In the event of any inconsistency between the terms of the Operating Agreement and this Amendment, the terms of this Amendment shall control. This Amendment shall inure to the benefit of, and shall be binding upon, each of the parties, their estates, heirs, personal representatives and assigns. This Amendment may be executed in any number of counterparts, each of which shall be an original, but such counterparts together shall constitute one and the same Amendment. Except as modified by this Amendment, the Operating Agreement is hereby ratified and confirmed by the parties.

*[SIGNATURES ON FOLLOWING PAGE]*

 6691427

IN WITNESS WHEREOF, the undersigned have set their hands as of the date first above written.

<div style="margin-left: 40%;">

MEMBERS:

**PEACHTREE HOTEL GROUP II, LLC**, a
Georgia limited liability company

By: _____
Jatin R. Desai, Manager


**JAX FAIRFIELD HOTEL GROUP, LLC**, a
Florida limited liability company

By: _____
Chittranjan K. Thakkar, Manager

</div>

JAX Fairfield Financial, LLC is hereby made a party to this Amendment solely for the purpose of acknowledging and agreeing to the provisions contained in Section 5(b) hereof:

<div style="margin-left: 40%;">

**JAX FAIRFIELD FINANCIAL, LLC**, a
Florida limited liability company

By: _____
Chittranjan K. Thakkar, Manager

</div>

MAY-15-2012  10:44       DICKINSONGIBBONS                          9415524615      P.008

IN WITNESS WHEREOF, the undersigned have set their hands as of the date first above written.

MEMBERS:

PEACHTREE HOTEL GROUP II, LLC, a
Georgia limited liability company

By:_____
    Jatin R. Desai, Manager


JAX FAIRFIELD HOTEL GROUP, LLC, a
Florida limited liability company

By: _____
    Chittranjan K. Thakkar, Manager


JAX Fairfield Financial, LLC is hereby made a party to this Amendment solely for the purpose of acknowledging and agreeing to the provisions contained in Section 5(b) hereof:

JAX FAIRFIELD FINANCIAL, LLC, a
Florida limited liability company

By: _____
    Chittranjan K. Thakkar, Manager


*SIGNATURE PAGE TO*
*FIRST AMENDMENT TO OPERATING AGREEMENT OF*
*PHG JACKSONVILLE, LLC*

6691427

Date: May 15 2012

## PARTICIPATION AGREEMENT

**WHEREAS**, Jax Fairfield Financial, LLC, a Florida limited liability company (*"JAX"*) originates loans related to the hospitality industry and other industries;

**WHEREAS**, JAX desires to sell to PHG Jacksonville, LLC, a Georgia limited liability company ("Participating Lender") and Participating Lender desires to purchase from JAX, a participation in JAX's loans described below (hereinafter collectively referred to as the *"Loan"*) on the terms and conditions set forth herein; and

**WHEREAS**, the parties intend hereby to convey title to the participation interest purchased by the Participating Lender and nothing herein shall be construed as creating a relationship of debtor and creditor between JAX and Participating Lender;

**NOW THEREFORE**, for and in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>**Purchase and Conveyance of Participation Interest**</u>. Subject to the terms and conditions of this Agreement, JAX hereby sells, grants, transfers, assigns, and conveys to Participating Lender, and Participating Lender hereby agrees to purchase and acquire from JAX, title to an undivided interest and participation in the Loan as described below, together with title to an undivided interest in any and all security interests, security titles or other encumbrances which JAX has (or will have upon Loan closing) in or to any personal or real property collateral to secure the Loan (the *"Collateral"*) and all direct and indirect proceeds of such Collateral (collectively, the *"Participation Interest"*). Participating Lender's interest in the Loan, expressed as a percentage, is 46.956% (the *"Participant's Share"*) and expressed as a dollar amount is $1,911,106.20 (the *"Participation Amount"*). In exchange for its Participation Interest, Participating Lender agrees to transfer, assign, and convey to JAX, and JAX hereby agrees to assume and acquire from Participating Lender, title to an undivided interest and participation in the Loan as described in that certain commitment to the Borrower dated February 15, 2012, together with title to an undivided interest in any and all security interests, security titles or other encumbrances which Participating Lender will have upon Loan closing in or to the Collateral and all direct and indirect proceeds of such Collateral, in an amount not to exceed $1,911,106.20 in the aggregate (the *"Participation Payment"*) as the purchase price for the Participation Interest. The respective interests of JAX and Participating Lender in the Loan at any given time shall be in direct proportion to the aggregate amount advanced by each of them in accordance with Section 5 below up to that time. JAX's portion of the Loan hereunder, expressed as a percentage is 53.044% (the *"JAX Share"*), and expressed as a dollar amount is $2,158,893.80 (the *"Retained Amount"*).

| Borrower(s): | Embarc, LLC, a Florida limited liability company |
| --- | --- |
| Guarantor(s): | Rogi Krecek; Michael Krecek; |
| Address: | 5661 Windhover Drive<br>Orlando, FL 32819 |
| Total | Participation Amount:     $1,911,106.20 |

938388/6

6680414 v04

EXHIBIT

C

| Principal Amount | Retained Amount:        $2,158,893.80 |
|---|---|
| Participating Lender Participant's Share (%) | 46.956% |
| JAX Share(%) | 53.044% |
| Servicing Fee | None |
| Date of Note: | Amended and Restated Promissory Note dated May __, 2012 |
| Maturity: | May 31, 2014 |
| Interest Rate (Participating Lender): | 10% |
| Interest Rate (JAX): | 10% |
| Collateral: | Mortgage, Assignment of Leases and Rents and Security Interest, dated May __, 2012 |
| Loan Purpose: | Acquisition and Refurbishment |
| Participation Basis: | Advances: Single Disbursement of Total<br><br>Future Advances, if any:   Pro Rata In<br><br>Repayment: Pro Rata Out, except in the event of default, then, Last Out |

2.    **Relationship Created.** This Agreement is intended, and shall be construed, to convey title to the Participation Interest to the Participating Lender. It is expressly understood that the relationship between JAX and Participating Lender created hereunder pertaining to the Participation Interest shall be that of a seller and purchaser, respectively, and nothing herein contained is intended, or shall be construed, as creating a loan by Participating Lender to JAX or any other relationship of debtor and creditor or any fiduciary relationship between JAX and Participating Lender. The parties acknowledge and understand that this Agreement provides specific remedies for a default by any Borrower (set forth in Section 9 of this Agreement) and remedies for a breach by JAX (set forth in Section 10 of this Agreement) and Participating Lender (set forth in Sections 11 and 12 of this Agreement). Participating Lender acknowledges and agrees that, by purchasing the Participation Interest, it is participating in the Loan and is not investing in a business enterprise or purchasing a security.

3.    **Purpose of Loan; Rank of Participation.** The Participating Lender's Participation Interest shall be of equal rank and priority in lien, and neither Participating Lender nor JAX shall have priority over the other participant in the Loan.

4.    **Credit Condition of the Borrower(s); Access to Credit Information.** It is understood and agreed that Participating Lender, and not JAX, is responsible for making the ultimate credit decision

938388/6

6680414 v04

through the Participating Lender's own review of information pertaining to the Loan. Consequently, credit evaluation performed by JAX must be independently verified and supplemented by Participating Lender's review of individual Borrower(s) information with respect to the Loan, sufficient for Participating Lender to make its own credit decision with respect to its purchase of the Participation Interest and to monitor the Loan on an ongoing basis. With respect to the Loan, Participating Lender represents and warrants to JAX that it has done its own due diligence in identifying borrower(s) and loan purposes, as well as underwriting the Loan made to a Borrower(s) under its own lending criteria.

5.     **Loan Advances.**     No future advances under the Loan are contemplated, and the respective undivided interests in the Loan as between JAX and Participating Lender are set forth in Section 1 above.

6.     **Payments.** JAX shall report to Participating Lender the amount corresponding to its Participant's Share of all accrued interest, payments other than principal amounts and all principal amounts collected and paid to JAX and, so long as no default shall exist with respect to the Loan, promptly remit the Participant's Share of such amounts to Participating Lender, based upon the following priorities. First, ratably between JAX and Participating Lender in an amount equal to their respective allocable shares (based on Participating Lender's Participant Share and the JAX Share) of interest, payments other than principal amounts and all principal amounts, so long as there is no default with respect to the Loan; in the event of a default with respect to the Loan, then to JAX until such time as JAX has received an amount equal to the Retained Amount, and then to Participating Lender in an amount equal to its Participation Amount.

7.     **Losses and Expenses.** Participating Lender shall share in accordance with Participating Lender's Participant's Share and JAX's respective percentage interests in the Loan, any losses and expenses sustained in connection with the Loan.   Participating Lender shall not be entitled to reimbursement for any expenses it incurs in connection with its acquisition or ownership of its Participation Interest. Participating Lender shall promptly remit to JAX, upon demand, its proportionate share of all expenses incurred by JAX in connection with the Loan, including, without limitation, taxes, insurance premiums, and other costs and expenses incurred in connection with the preservation of Collateral and attorneys fees, costs and other expenses incurred in any action in response to default under any credit, guaranty, security or similar agreement or instrument evidencing or providing for a Loan or any guaranty thereof (collectively, the "*Loan Documents*").

8.     **Default by Borrower.**

(a)     JAX shall promptly, after JAX's having knowledge thereof, inform Participating Lender of any circumstances (a "*Default*") which JAX has determined, in its reasonable, commercial judgment could have a material, adverse affect on the Loan or the value of the Collateral securing the Loan. JAX shall keep Participating Lender informed with respect to such circumstances and any actions taken by JAX in connection therewith.

(b)     If foreclosure upon the Collateral is the action taken by JAX, JAX shall promptly remit to Participating Lender its Participant's Share, as hereinabove specified, of all net proceeds received by JAX as a consequence of such foreclosure proceeding, including, without limitation, net proceeds of foreclosure sale, net income from operation of the Collateral pending liquidation, and net proceeds of any resale of the Collateral. If JAX acquires an interest in the Collateral through foreclosure, deed in lieu of foreclosure or otherwise, JAX and Participating Lender shall have undivided beneficial interests in the Collateral equal to their respective percentage interests in the Loan and title will be taken in the name of JAX or its nominees. Participating Lender hereby waives any statutory or common law right of partition or any other similar rights or remedies. The commercially reasonable decision of JAX shall be binding as to the best manner in which to proceed with respect to the completion of construction, operation,

- 3 -

management and disposition of the Collateral; provided that JAX may not sell or otherwise dispose of the Collateral without the prior approval of Participating Lender. All expenses incurred in connection with any action taken pursuant to the provisions of this Section 8 shall be shared by JAX and Participating Lender in accordance with their respective percentage interests in the Loan.

9.      **Breach by JAX.**  If JAX shall fail to cure any material default by JAX under this Agreement within thirty (30) days after notice from Participating Lender specifying the default, Participating Lender shall, in addition to all other remedies available to it at law or in equity, have the right to maintain an action for specific performance against JAX to enforce Participating Lender's rights under this Agreement or, so long as Participating Lender is not itself in default under this Agreement, the right to (but not an obligation to) require that JAX repurchase the Participation Interest for an amount equal to the Participation Amount, plus Participating Lender's proportionate share of accrued and unpaid interest and fees up to the date of repurchase, less Participating Lender's proportionate share of any unreimbursed expenses incurred by JAX in connection with the Loan up to the date of such repurchase.

10.     **Breach by Participating Lender.**  JAX shall, in addition to all other remedies available to it at law or in equity, have the unilateral right (but not the obligation) to require that Participating Lender purchase, without regard to self-imposed lending limits of Participating Lender, the JAX Share of the Loan, up to the amount that Participating Lender is permitted to purchase without violating regulatory lending limits requirements, for an amount equal to the JAX Share, or portion thereof then being sold by JAX, of the outstanding principal amount of the Loan

JAX shall, in addition to all other remedies available to it at law or in equity, have the unilateral right to offset and deduct from any payments otherwise due to Participating Lender under this Agreement, the amount of any unreimbursed expenses due from Participating Lender pursuant to Section 8 or Advances due under Section 5 and not timely made by Participating Lender.

11.     **JAX Representations and Warranties.**  JAX hereby represents and warrants to Participating Lender that JAX has good title to and full right, power and authority to convey to Participating Lender the Participation Interest free and clear of any and all liens, security interests and encumbrances created by JAX.

Participating Lender expressly acknowledges that, except as set forth in Section 14 hereinabove, JAX has made and is making hereby to Participating Lender no warranties or representations, express or implied, with respect to the Loan or the Loan Documents and has assumed no responsibility with respect to the legality, sufficiency, enforceability, or collectibility of the Loan or any document (including, without limitation, the Loan Documents) relative thereto or of any Collateral and JAX has assumed no responsibility for the financial condition of any Borrower.

12.     **Administration of Loan.**

(a)     All servicing rights under the Loan Agreements are retained by JAX. JAX shall, until all amounts payable with respect to Participating Lender's Participation Interest have been paid in full: (i) exercise commercially reasonable care in administering the Loan; (ii) receive for the benefit of itself, and Participating Lender, all payments of interest, principal, fees and other sums due from any Borrower with respect to the Loan; (iii) to the extent that JAX actually receives in good funds interest, principal, and any other fees or sums owing by a Borrower(s) with respect to the Loan ("*Collections*"), hold, and within two (2) business days of JAX's receipt of the Collections, remit to Participating Lender by ACH or wire transfer, Participating Lender's share of Collections received by JAX during the preceding month with respect to the Loan, net of costs and expenses as described herein or amounts required to be advanced by Participating Lender hereunder, as determined on the basis of Participating Lender's

Participants Share in the Loan and in accordance with the provisions of Section 7 or subsection(d) hereof and the other provisions of this Agreement; and (iv) have all rights with respect to the completion, operation, management, maintenance, improvement, insurance, repair and replacement of any Collateral pending the disposition thereof. Amounts received by JAX from any collections or set-offs by JAX in connection with any unrelated debts of any Borrower or of any person or entity shall not constitute Collections. JAX shall make all commercially reasonable efforts under the circumstances then applicable to consult with Participating Lender with respect to actions taken or to be taken by JAX, as originator of the Loan and as servicer hereunder, but in all events, except as provide in section (b), the decision of JAX shall control. JAX shall not delegate its loan servicing and administration duties to any third party without the prior written consent of Participating Lender.

(b)     Notwithstanding the foregoing provisions of subsection 12(a), JAX, without Participating Lender's prior consent, shall not make or consent to: (i) any decrease in the interest rate or the principal amount of the Loan, or any change in the scheduled term and maturity date, specifically including, but not limited to accepting a discounted pay off of the Loan or any discounted debt service payment with respect to the Loan; (ii) any release, substitution or exchange of any of the Collateral or Guaranty given as security for the Loan; (iii) any acceleration of the maturity date of any Loan or any extension or renewal of any Loan; (iv) any foreclosure or other legal action or proceeding for the collection or enforcement of any Loan; (v) any material modification, amendment, or termination of any terms or conditions of the Loan Documents (including, without limitation, the specific Collateral, pledges, guaranties made, required covenants and like provisions); or (vi) any waiver of any late fees, default interest or other payments under the Loan; or (vii) the exercise of any consent rights to (A) any fees or other compensation to be paid to any permitted servicer of the Loan or (B) any third party contracts to be entered into by any permitted servicer of the Loan. Participating Lender agrees to execute and deliver to JAX all documents and other writings which JAX may reasonably request to facilitate the exercise of all rights with respect to any Collateral and to effect a disposition of Collateral.

(c)     JAX shall keep and maintain at its offices, such files and records of matters pertaining to the Loan, including all such documentation, actions, and information as is set forth in Participating Lender's commitment letter, if any, which is expressly incorporated by reference herein, in a commercially reasonable manner. All such files and records shall be available for inspection by Participating Lender or its agent after reasonable notice to JAX and during normal business hours. JAX shall furnish to Participating Lender, or make available to Participating Lender, electronically, via a secure website, database or other secure means of access, copies of the Loan Documents and all other documents, whether pursuant to the Loan Documents or otherwise, relative to the Loan or the Collateral. JAX will appropriately mark its records to reflect Participating Lender's interest in the Loan and will include in JAX's statements or reports of financial condition only JAX's Retained Amount of the Loan.

(d)     All Collections received by JAX in connection with the Loan, shall be applied, as between JAX and Participating Lender, first, to JAX's reasonable costs and expenses incurred in collecting the Loan, second, ratably between JAX and Participating Lender to interest earned on the Loan, and third ratably to the unpaid principal balances of the Participating Lender's Participation Interest, and the JAX Share of the Loan.

**13.     Participating Lender Representations and Warranties.** Participating Lender represents and warrants to JAX that:

(a)     Participating Lender has full right, power and authority to purchase the Participation Interest and to enter into and perform this Agreement. Its participation in the Loan does not violate any agreement, law, rule, regulation or supervisory standard by which Participating Lender is bound.

(b)    Participating Lender is acquiring the Participation Interest for its own account for investment purposes and without any present intention of reoffering, selling, subparticipating or otherwise transferring the Participation Interest or any portion thereof.

(c)    Participating Lender is a sophisticated investor and has such knowledge and experience in the origination, sale and/or purchase of performing leases and secured loans as to (1) enable it to evaluate the merits and risks of a prospective acquisition and ownership of the Participation Interest and to make an informed decision with respect thereto; (2) enable it to make its own independent investigation and evaluation of the Participation Interest, subject, in any event, to Participant's reliance on JAX for (x) the truth of the representations and warranties contained herein and (y) the performance of JAX of all of its obligations under this Agreement.

(d)    Participating Lender acknowledges that it has made such examination, review and investigation of the facts and circumstances necessary to evaluate the Participation Interest as it deems necessary or appropriate to form a basis for its evaluation of the purchase of the Participation Interest pursuant to the terms of this Agreement. Except as to the representations, warranties, covenants and agreements expressly provided by JAX to Participating Lender in this Agreement, Participating Lender is assuming all risks with respect to the completeness, accuracy or sufficiency of the Loan Documents and the Collateral and any information pertaining to them. Participating Lender further acknowledges in acquiring the Participation Interest, Participating Lender is assuming the risk of full or partial loss which is inherent with the credit, collateral and collectibility risks associated with the purchase of the Participation Interest except to the extent otherwise expressly provided for in this Agreement.

14.    **Liability of JAX.** JAX agrees to exonerate, indemnify, pay and protect, defend and save and hold Participating Lender and the directors, officers, shareholders, employees, agents, successors and assigns of Participating Lender, harmless from and against any claims, actions, administrative governmental and/or regulatory proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, liabilities (including sums paid in settlement of claims), interest, or losses, including reasonable attorneys' and paralegals' fees and expenses (including, without limitation, any such fees and expenses incurred in enforcing this Participation Agreement or collecting any sums due hereunder), together with all other costs and expenses of any kind or nature (collectively, the "Costs") that arise directly or indirectly from or in connection with and in the case of negligence or willful misconduct of JAX, or breach of, or default by JAX of the terms of this Agreement or the Loan Documents. Without limiting the generality of the foregoing, JAX:  (a) may consult with legal counsel, public accountants and other experts selected by JAX (b) makes no warranty or representation to the Participating Lender except as expressly provided in this Agreement, and shall not be responsible to the Participating Lender for any statements, warranties or representations made by others in connection with this Agreement or the Loan Documents, and (c) shall not be responsible for the performance of the Borrower under the Loan Documents.

15.    **Amendment and Modification.**  No amendment, change, modification or termination of this Agreement shall be valid or binding upon the parties hereto unless such amendment, change, modification or termination shall be in writing and signed by both parties.

16.    **Subparticipations, Successors and Assigns.**  Neither Participating Lender nor JAX shall subparticipate, sell or transfer all or any interest in its Participation Interest without the prior written consent of the other party. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective permitted successors and assigns.

**17.    Law Governing; Jurisdiction.** This Agreement has been executed by Participating Lender and delivered to JAX for acceptance and has been executed and accepted by JAX within the State of Georgia and the laws of the State of Georgia shall govern the interpretation, validity and enforceability hereof, without regard to the conflicts of law rules thereof. Participating Lender further agrees that all actions or proceedings instituted by the Participating Lender or JAX hereunder shall be brought in a court of competent jurisdiction in Fulton County, Georgia or in the United States District Court for the Northern District of Georgia, Atlanta Division. Participating Lender irrevocably submits to the nonexclusive jurisdiction of such court for the purposes of all legal proceedings arising out of or relating to this Agreement and irrevocably waives any present or future objection to venue in any such court and any present or future claim that any such court is an inconvenient forum in connection with any action or proceeding relating to this Agreement. PARTICIPATING LENDER AND JAX EACH WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY ON ANY ISSUES OR CLAIMS ARISING UNDER THIS AGREEMENT.

**18.    Captions.** Titles or captions of paragraphs contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

**19.    Severability.**   In the event that any provision of this Agreement is held to be invalid or unenforceable, such invalidity or enforceability shall not affect the validity or enforceability of any other provision hereof.

**20.    Entire Agreement.** This Agreement, together with any agreements referenced herein, contains the entire understanding between the parties as to the subject matter hereof and supersedes any prior written or oral agreement respecting the subject matter hereof. This Agreement has been fully negotiated by both parties with the representation and advice of their legal counsel, to the extent so desired, and any rule of construction or contract interpretation regarding the construction or interpretation against the draftsman of any provision of this Agreement shall have no application hereunder and is hereby expressly waived. Time is of the essence of this Agreement.

**21.    Counterparts.** This document may be executed in two or more counterparts, each of which shall be deemed to be an original and which together will constitute one and the same document.

**22.    Notices.** Any and all notices, elections, demands, requests and responses thereto permitted or required to be given under this Agreement shall be in writing (or in the case of requests for an Advance pursuant to Section 6, via e-mail or facsimile), signed by or on behalf of the party giving the same, and shall be deemed to have been properly given and shall be effective upon being personally (or in the case of a request for Advance, electronically) delivered, or upon being deposited in the United States mail, postage prepaid, certified with return receipt requested, to the other party at the address of such other party set forth below or at such other address within the continental United States as such other party may designate by notice specifically designated as a notice of change of address and given in accordance herewith; provided, however, that the time period in which a response to any such notice, election, demand or request must be given shall commence on the date of receipt thereof; and provided further that no notice of change of address shall be effective until the date of receipt thereof. Personal delivery to a party or to any officer, partner, agent or employee of such party at said address shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response, if given to JAX, shall be addressed as follows:

-7-

**JAX:** 5875 Peachtree Industrial Blvd.
Suite 340, Norcross, GA  30092
Attn:    Chittranjan K. Thakkar
Telephone No.: _____
Facsimile No.: _____
E-mail Address: cthakkar@dctsystems.net

and, if given to Participating Lender, shall be addressed as follows:

**Participating Lender:** 5607 Glenridge Drive,
Suite 430
Atlanta, Georgia, 30342
Attn:    Gregory M. Friedman
Telephone No.: 404.497.4119
Facsimile No.: 678.358.7599

E-mail Address: 404.497.4114

In the event JAX elects to solicit Participating Lender's consent or approval of any action, Participating Lender shall not be deemed to have given such consent or approval, unless within ten (10) days after the date notice requesting any such consent or approval is given by JAX to Participating Lender as provided herein, JAX shall have received written notice of Participating Lender's refusal to consent or approve such action.  This Section shall not be construed to require the giving of notice to any person in any situation.

**23.    Participation Not a Security.**  The interest of Participating Lender in the Loan shall not be deemed to be a security within the meaning of the Securities Act of 1933 or the Securities Exchange Act of 1934.

**24.    Intent of Parties.**  Neither the execution of this Agreement, nor the sharing of Collections or ownership interest in the Collateral, is intended to be or shall be construed to be the formation of a partnership or joint venture between JAX and Participating Lender.  This Agreement shall not be deemed to constitute or represent a pledge of any interest in the Loan by JAX to Participating Lender, or a loan from Participating Lender to JAX.  In the event that any change in GAAP, effective subsequent to the date of this Agreement, would result in the treatment of the transaction described herein as being other than a purchase and sale of a participation interest in the Loan, at the request of either JAX or the Participating Lender, the parties agree to negotiate in good faith any necessary amendment to this Agreement or modification to the transaction to preserve the original intent of the parties as set forth herein which is to accomplish a purchase and sale of a participation interest in the Loan.  "GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, consistently applied.

**25.    Confidentiality.**  The Participating Lender and JAX agrees to maintain the confidentiality, so long as the Loan is not in default, of this Participation Agreement and the Loan Documents, except that each may disclose the same, in confidence, to its attorneys and auditors, and to any regulatory body having authority over it in connection with any examination by such regulatory body.

26.    <u>Survival</u>.  The provisions of Sections 3, 6, 7, 8, 9, 10, 11, 12, 14, 17, 20, 24, 25 and 26 shall survive the termination of this Agreement.

[The remainder of this page left intentionally blank.]

938388/6                                                                                    6680414 v04

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement, and affix their respective seals hereto, all as of the date first above set forth.

JAX:                                    Participating Lender:

Jax Fairfield Financial, LLC            PHG Jacksonville, LLC

By: _____            By: _____
    Chittranjan K. Thakkar                  Chittranjan K. Thakkar
    Manager                                 Manager


        [Seal]                                      [Seal]


*[Signature page to Participation Agreement]*

- 10 -

938388/6                                                    6680414 v04

Downloaded from

JS44 (Rev. 1/13 NDGA) **CIVIL COVER SHEET**

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

## I. (a) PLAINTIFF(S)

Peachtree Hotel Group II, LLC, derivatively on behalf of PHG Jacksonville, LLC

## DEFENDANT(S)

JAX Fairfield Hotel Group, LLC, JAX Fairfield Financial, LLC, Chttranjan K. Thakkar; Niloy Thakkar; Rohan Thakkar; Nilhan Financial, LLC; NRCT, LLC; Niloy & Rohan, LLC; DCT Systems Group, LLC; Nilhan Developers, LLC; Sugarloaf Centre, LLC; Bay Circle Properties, LLC; Saloni Thakkar; and Wells Fargo Bank, N.A.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Unknown
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** Unknown
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS** (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS)

Christopher B. Hall
Hall & Lampros, LLP
1230 Peachtree St. NE
Suite 950
Atlanta, GA 30309

**ATTORNEYS** (IF KNOWN)

Parker, Hudson, Rainer & Dobbs LLP
C. Edward Dobbs
Joshua J. Lewis
285 Peachtree Center Ave., NE, Ste 1500
Atlanta, GA 30303

## II. BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 U.S. GOVERNMENT PLAINTIFF
- [ ] 2 U.S. GOVERNMENT DEFENDANT
- [X] 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)
- [ ] 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|
| [X] 1 | [ ] 1 | CITIZEN OF THIS STATE | [ ] 4 | [X] 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| [ ] 2 | [ ] 2 | CITIZEN OF ANOTHER STATE | [ ] 5 | [ ] 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| [ ] 3 | [ ] 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 6 | [ ] 6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 ORIGINAL PROCEEDING
- [X] 2 REMOVED FROM STATE COURT
- [ ] 3 REMANDED FROM APPELLATE COURT
- [ ] 4 REINSTATED OR REOPENED
- [ ] 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)
- [ ] 6 MULTIDISTRICT LITIGATION
- [ ] 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This action is being removed, pursuant to 28 USC 1334, 1452 and 1446, for referral to the Bankruptcy Court of this District because the claims asserted in this action are "related to" the bankruptcy cases being jointly administered in the case styled In re Bay Circle Properties, LLC, et al., Case No. 15-58440-wlh, United States Bankruptcy Court for the Northern District of Georgia.

**(IF COMPLEX, CHECK REASON BELOW)**

- [ ] 1. Unusually large number of parties.
- [ ] 2. Unusually large number of claims or defenses.
- [ ] 3. Factual issues are exceptionally complex
- [ ] 4. Greater than normal volume of evidence.
- [ ] 5. Extended discovery period is needed.
- [ ] 6. Problems locating or preserving evidence
- [ ] 7. Pending parallel investigations or actions by government.
- [ ] 8. Multiple use of experts.
- [ ] 9. Need for discovery outside United States boundaries.
- [ ] 10. Existence of highly technical issues and proof.

**CONTINUED ON REVERSE**

| FOR OFFICE USE ONLY | | | | |
|---|---|---|---|---|
| RECEIPT # | AMOUNT $ | APPLYING IFP | | MAG. JUDGE (IFP) |
| JUDGE | MAG. JUDGE (Referral) | NATURE OF SUIT | CAUSE OF ACTION | |

## VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- ☐ 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- ☐ 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- ☐ 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- ☐ 110 INSURANCE
- ☐ 120 MARINE
- ☐ 130 MILLER ACT
- ☐ 140 NEGOTIABLE INSTRUMENT
- ☐ 151 MEDICARE ACT
- ☐ 160 STOCKHOLDERS' SUITS
- ☐ 190 OTHER CONTRACT
- ☐ 195 CONTRACT PRODUCT LIABILITY
- ☐ 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 210 LAND CONDEMNATION
- ☐ 220 FORECLOSURE
- ☐ 230 RENT LEASE & EJECTMENT
- ☐ 240 TORTS TO LAND
- ☐ 245 TORT PRODUCT LIABILITY
- ☐ 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- ☐ 310 AIRPLANE
- ☐ 315 AIRPLANE PRODUCT LIABILITY
- ☐ 320 ASSAULT, LIBEL & SLANDER
- ☐ 330 FEDERAL EMPLOYERS' LIABILITY
- ☐ 340 MARINE
- ☐ 345 MARINE PRODUCT LIABILITY
- ☐ 350 MOTOR VEHICLE
- ☐ 355 MOTOR VEHICLE PRODUCT LIABILITY
- ☐ 360 OTHER PERSONAL INJURY
- ☐ 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- ☐ 365 PERSONAL INJURY - PRODUCT LIABILITY
- ☐ 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- ☐ 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 370 OTHER FRAUD
- ☐ 371 TRUTH IN LENDING
- ☐ 380 OTHER PERSONAL PROPERTY DAMAGE
- ☐ 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- ☐ 422 APPEAL 28 USC 158
- ☐ 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- ☐ 441 VOTING
- ☐ 442 EMPLOYMENT
- ☐ 443 HOUSING/ ACCOMMODATIONS
- ☐ 444 WELFARE
- ☐ 440 OTHER CIVIL RIGHTS
- ☐ 445 AMERICANS with DISABILITIES - Employment
- ☐ 446 AMERICANS with DISABILITIES - Other
- ☐ 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- ☐ 462 NATURALIZATION APPLICATION
- ☐ 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- ☐ 463 HABEAS CORPUS- Alien Detainee
- ☐ 510 MOTIONS TO VACATE SENTENCE
- ☐ 530 HABEAS CORPUS
- ☐ 535 HABEAS CORPUS DEATH PENALTY
- ☐ 540 MANDAMUS & OTHER
- ☐ 550 CIVIL RIGHTS - Filed Pro se
- ☐ 555 PRISON CONDITION(S) - Filed Pro se
- ☐ 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- ☐ 550 CIVIL RIGHTS - Filed by Counsel
- ☐ 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- ☐ 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- ☐ 710 FAIR LABOR STANDARDS ACT
- ☐ 720 LABOR/MGMT. RELATIONS
- ☐ 740 RAILWAY LABOR ACT
- ☐ 751 FAMILY and MEDICAL LEAVE ACT
- ☐ 790 OTHER LABOR LITIGATION
- ☐ 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- ☐ 820 COPYRIGHTS
- ☐ 840 TRADEMARK

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- ☐ 830 PATENT

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- ☐ 861 HIA (1395ff)
- ☐ 862 BLACK LUNG (923)
- ☐ 863 DIWC (405(g))
- ☐ 863 DIWW (405(g))
- ☐ 864 SSID TITLE XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- ☐ 870 TAXES (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- ☐ 375 FALSE CLAIMS ACT
- ☐ 400 STATE REAPPORTIONMENT
- ☐ 430 BANKS AND BANKING
- ☐ 450 COMMERCE/ICC RATES/ETC.
- ☐ 460 DEPORTATION
- ☐ 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- ☐ 480 CONSUMER CREDIT
- ☐ 490 CABLE/SATELLITE TV
- ☐ 891 AGRICULTURAL ACTS
- ☐ 893 ENVIRONMENTAL MATTERS
- ☐ 895 FREEDOM OF INFORMATION ACT
- ☐ 950 CONSTITUTIONALITY OF STATE STATUTES
- ☐ 890 OTHER STATUTORY ACTIONS
- ☐ 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- ☐ 410 ANTITRUST
- ☐ 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- ☐ 896 ARBITRATION (Confirm / Vacate / Order / Modify)

**\* PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3**

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23     DEMAND $_____

JURY DEMAND ☐ YES ☐ NO (CHECK YES **ONLY** IF DEMANDED IN COMPLAINT)

## VIII. RELATED/REFILED CASE(S) IF ANY

JUDGE _Hagenau_     DOCKET NO. _15-58440_

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES: (CHECK APPROPRIATE BOX)
- ☐ 1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 2. SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 4. APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- ☐ 5. REPETITIVE CASES FILED BY PRO SE LITIGANTS.
- ☐ 6. COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):
- ☐ 7. EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____, WHICH WAS DISMISSED. This case ☐ IS ☐ IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

/s/ Joshua J. Lewis                                        10/9/2015

SIGNATURE OF ATTORNEY OF RECORD                    DATE